[No. B195211. Second Dist., Div. Three. June 9, 2008.]

CALIFORNIA GOLF, L.L.C., Plaintiff and Appellant, v.
PERRY COOPER et al., Defendants and Respondents.

---

**COUNSEL**

Lowe & Baik and Jeffre T. Lowe for Plaintiff and Appellant.

Halavais & Associates, Coby R. Halavais and Thomas G. Kemerer for Defendants and Respondents.

---

**OPINION**

**CROSKEY, J.**—Plaintiff, California Golf, L.L.C. (California Golf), appeals from a summary judgment entered in favor of cross-defendants and cross-complainants Perry Cooper, Shari Cooper, Ruth Cooper and Sami Mikhael Ostayan (collectively, the respondents). California Golf is the foreclosing beneficiary under a recorded deed of trust. The dispute in this case arises from a nonjudicial foreclosure sale of a parcel of real property. The respondents purchased the subject property with cashier's checks at a trustee's sale. The respondents then apparently decided that they should not have purchased the property for the bid price. Intending to induce the bank that had issued the cashier's checks to stop payment on those checks, respondents submitted to the bank affidavits, *under penalty of perjury,* in which they falsely stated that the cashier's checks had been lost and had never been endorsed.

██ California Golf pleaded several causes of action against respondents, including fraud and breach of warranty. The breach of warranty cause of action was based on California Uniform Commercial Code section 3312, which sets forth the method by which the original purchaser of a cashier's check can file a declaration of loss, stating that the loss of possession was not

the result of a transfer by the person filing the declaration. That section further provides that "[d]elivery of a declaration of loss is a warranty of the truth of the statements made in the declaration. The warranty is made to the obligated bank and any person entitled to enforce the check." (Cal. U. Com. Code, § 3312, subd. (b).)[1]

The respondents claim that, regardless of whether California Golf sufficiently alleged causes of action for breach of warranty and fraud, the fact that respondents' alleged commission of these torts occurred in the context of a nonjudicial foreclosure sale immunizes them from any such liability. Respondents contend that under Civil Code section 2924h, governing nonjudicial foreclosure sales, the trustee's sale was effectively "cancelled" by the bank's "stop payment" and California Golf's *only* remedy was to notice a new sale. The trial court agreed and held the only remedy against respondents was to renotice the sale and recover from them the costs of the new notice of sale.

In our view, this was error. California Golf's remedy is not limited by Civil Code section 2924h. We therefore reverse.

### *FACTUAL AND PROCEDURAL BACKGROUND*[2]

In 2004, California Golf obtained a beneficial interest in the property at issue. Its predecessor in interest was Hanil Bank. In 1988, Hanil Bank had filed a complaint seeking judicial foreclosure of its deed of trust on the property. In June 1989, Hanil Bank obtained a judgment of judicial foreclosure, and in 1991, it obtained a writ of sale. The property, however, was not sold. In 1999, Hanil Bank renewed its judgment but, again, the property was not sold. In 2004, Hanil Bank transferred its beneficial interest to California Golf.

Subsequently, California Golf chose to pursue *nonjudicial* foreclosure under the deed of trust. A foreclosure sale was duly noticed, and held on January 14, 2005. There were two active bidders at the sale, California Golf

---

[1] Comment No. 2 to California Uniform Commercial Code following this section states in relevant part: "A claimant who delivers a declaration of loss makes a warranty of the truth of the statements made in the declaration. The warranty is made to the obligated bank and anybody who has a right to enforce the check. If the declaration of loss falsely alleges loss of a cashier's check that did not in fact occur, a holder of the check who was unable to obtain payment . . . would have a cause of action against the declarer for breach of warranty." (Official Comments on U. Com. Code, Deering's Ann. Cal. U. Com. Code (1999 ed.) foll. § 3312, p. 428.)

[2] The facts we recite are reflected in the record and are not disputed by any of the parties.

(the foreclosing beneficiary) and respondent Perry Cooper. Bidding opened at $400,000, and quickly reached $600,000. At this point, California Golf made a full credit bid, in the amount of $957,642.31. Perry Cooper bid one dollar in excess of this amount. There were no further bids, and Perry Cooper was the winning bidder. Immediately thereafter, Perry Cooper presented 13 cashier's checks to the trustee, totaling $960,000.[3] All of these checks had been issued by Wells Fargo Bank, National Association (Wells Fargo), and Perry Cooper was the named payee on each of them.[4] He endorsed the checks in blank and gave them to the foreclosure trustee as payment for the foreclosed real property. The trustee deposited the checks into its checking account for California Golf's benefit.

Approximately two hours after the completion of the trustee's sale, respondent Sami Ostayan left a voicemail message for Joseph Park, an officer of California Golf, indicating that his partner, Perry Cooper, had made a mistake in bidding $957,000 for the property. Ostayan, however, stated that he and his partners were still willing to purchase the property, but only for the sum of $400,000.[5]

Later on that same day, January 14, 2005, Perry Cooper went to Wells Fargo and signed, *under penalty of perjury,* thirteen "Affidavit As To Lost, Destroyed or Stolen Cashier's or Official Check" forms. In these affidavits, Perry Cooper acknowledged that he had been duly sworn and stated that he had "lost or never had possession of the [described] check" and that his "loss of possession was not the result of transfer by [Perry Cooper] or a lawful

---

[3] The record does not reflect how or in what manner Perry Cooper was given credit for the difference between the amount of his bid and the amount of the checks.

[4] Actually, the checks carrying the words "cashier's check" totaled $915,000. There were also checks issued by Wells Fargo, denominated as "official checks," which totaled $45,000. All of the checks were drafted to "pay to the order of Perry Cooper or Shari Cooper or Ruth Cooper." For purposes of this appeal, the different designation of these checks is not significant and we will refer to all of the checks as cashier's checks.

[5] The following is a transcript of Ostayan's voicemail message: "Hi Joseph, It's Sam Ostayan again. Joseph, I just spoke to Perry Cooper. We may have a small problem here. You may like it or not. I did tell him not to . . . our impression is, like, we were going to buy it for $400 thousand. He told me he bought it for $900-something you know? So . . . and I promised him half the deal, but not at that price. So, give me a call, let me know if you're gonna take the property back and instruct the trustee to give us our checks back. We have no problem with it, you know? Give me a call as soon as you can Joseph. [Telephone number.] We will still go ahead with the deal if you agree to take the $400, but not the $900 thousand and change that he paid at the sale. When he told me he bought it, I was under the impression he bought it for the $400 thousand. So call me as soon as you can Joseph. Like we have two options. Give us the money back, keep the property and [unintelligible word] . . . or give us the property only for $400 thousand and we can work the logistics with it, alright? Take care, bye."

seizure." These statements were untrue. As already indicated, Perry Cooper had in fact endorsed and delivered those checks to the trustee earlier that day in payment of his successful bid.[6] Wells Fargo, relying on these affidavits, stopped payment on, and refused to honor, the checks.[7]

Because Wells Fargo refused to honor its cashier's checks, California Golf filed this action against Wells Fargo on March 2, 2005, for wrongful dishonor of its cashier's checks. Wells Fargo cross-complained against both California Golf and the respondents. In light of the affidavits of loss submitted by Perry Cooper,[8] Wells Fargo interpleaded the $960,000 by depositing that amount with the clerk. Wells Fargo took the position that, if California Golf was entitled to any damages beyond the $960,000, those damages were caused by Perry Cooper, not Wells Fargo.

Pursuant to a stipulation of the parties, and with leave of court, the respondents filed a complaint in intervention in which they stated their intention to unite with Wells Fargo in resisting California Golf's claims, and asserted that those claims were barred by the nonjudicial foreclosure statutes.[9] They also took the position that California Golf had come into possession of the cashier's checks by means of fraudulent misrepresentations regarding the condition of the subject property and the amount of money owed on the promissory note secured by the trust deed, and asserted that, on that basis, Perry Cooper had "submitted a stop payment order to Wells

---

[6] The originals of the thirteen endorsed cashier's checks have been in the custody of either the trustee (until August of 2005) or California Golf (from and after August 2005).

[7] Under California Uniform Commercial Code section 3312, subdivision (b)(1), the claim of someone filing a declaration of loss becomes enforceable "at the later of (i) the time the claim is asserted, or (ii) the 90th day following the date of the check, in the case of a cashier's check." Of the 13 cashier's checks at issue in this case, only one, for $100,000, was dated more than 90 days prior to the filing of the declarations of loss; the others were dated only weeks before. In other words, Perry Cooper's claim to the funds was immediately enforceable with respect to only $100,000; his claim to the remaining $860,000 would not be effective until some time in March 2005. Until the claim is enforceable "it has no legal effect and the obligated bank may pay the check . . . . Payment to a person entitled to enforce the check discharges all liability of the obligated bank with respect to the check." (Cal. U. Com. Code, § 3312, subd. (b)(2).)

[8] Included as exhibits to Wells Fargo's cross-complaint were 12 affidavits signed by Perry Cooper, one for each of 12 of the 13 checks used to pay for the purchase of the land. In each of the affidavits Perry Cooper stated that he had *lost* the cashier's or official check listed in such affidavit. The funds represented by the checks referenced in those 12 affidavits total $660,000. According to California Golf's appellate brief, late in the trial court proceedings in this case, Wells Fargo produced the thirteenth affidavit of loss signed by Perry Cooper, which was for a $300,000 cashier's check issued by Wells Fargo.

[9] The respondents also filed a cross-complaint against California Golf. They ultimately dismissed their cross-complaint, and it is not at issue in this appeal.

Fargo."[10] The respondents further alleged that, since Hanil Bank, California Golf's predecessor in interest, had previously obtained a judgment of *judicial* foreclosure, there was a binding election of remedies in connection with the deed of trust which precluded California Golf's recovery of damages arising from nonjudicial foreclosure.

The respondents then filed a motion for summary judgment/adjudication in which they addressed California Golf's complaint as well as the interpleader cause of action in Wells Fargo's cross-complaint.[11] Citing Civil Code section 2924h, subdivisions (c) and (d),[12] they asserted that the foreclosure sale had

---

[10] This is not the first time that we have had before us a dispute where one of the respondents sought to avoid performance of a successful foreclosure bid. Respondent Ostayan was a plaintiff in another case in which he sought to be relieved of his purchase of real property at a 1997 nonjudicial foreclosure sale by claiming to have been misled into purchasing the property. This court rejected his argument. (*Ostayan v. Serrano Reconveyance Co.* (2000) 77 Cal.App.4th 1411 [92 Cal.Rptr.2d 577].)

[11] California Golf contends that because the respondents were not named as defendants in its complaint, they had no authority to file a motion for summary judgment/adjudication concerning the complaint, and the trial court had no authority to grant their motion. That contention fails because the trial court properly permitted the respondents to file a complaint in intervention with respect to California Golf's complaint against Wells Fargo.

By uniting with Wells Fargo, the respondents "became 'entitled to avail [themselves] of all the procedure and remedies to which [Wells Fargo] would be entitled for the purpose of defeating the action or resisting the claims of the plaintiff[] . . . [.]' [Citations.] [¶] An intervening party is accordingly 'to be regarded as a plaintiff or as a defendant in the action . . . [depending upon] the party for whose success he seeks to intervene . . . [.]' [Citation.]" (*Timberidge Enterprises, Inc. v. City of Santa Rosa* (1978) 86 Cal.App.3d 873, 879 [150 Cal.Rptr. 606].) In *Timberidge,* interveners united with the defendant city and thus "were to be regarded as defendants in plaintiffs' action and their complaints in intervention as answers to plaintiffs' complaint." (*Ibid.*)

[12] Civil Code section 2924h (hereinafter, § 2924h) provides, in relevant part:

"(a) *Each and every bid made by a bidder at a trustee's sale under a power of sale contained in a deed of trust or mortgage shall be deemed to be an irrevocable offer by that bidder to purchase the property being sold by the trustee under the power of sale for the amount of the bid.* . . . [¶] (b) At the trustee's sale the trustee shall have the right (1) to require every bidder to show evidence of the bidder's ability to deposit with the trustee the full amount of his or her final bid in cash, a cashier's check drawn on a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state, or a cash equivalent which has been designated in the notice of sale as acceptable to the trustee prior to, and as a condition to, the recognizing of the bid, and to conditionally accept and hold these amounts for the duration of the sale, and (2) to require the last and highest bidder to deposit, if not deposited previously, the full amount of the bidder's final bid in cash, a cashier's check drawn on a state or national bank, . . . immediately prior to the completion of the sale, the completion of the sale being so announced by the fall of the hammer or in another customary manner. . . . [¶] (c) In the event the trustee accepts a check drawn by a credit union or a savings and loan association pursuant to this subdivision or a cash equivalent designated in the notice of sale, the trustee may withhold the issuance of the trustee's deed to the successful bidder submitting the check drawn by a state or federal credit union or savings and loan association or the cash equivalent until

been automatically rescinded because of the failure of consideration, and that California Golf's sole remedy for the respondents' refusal to carry through with their purchase of the property was to republish the notice of sale and collect from them the costs of republishing. California Golf opposed the motion and challenged the respondents' analysis of the provisions of section 2924h. In their reply papers, the respondents argued that the issue before the court was the meaning of the term "cash equivalent," as used in section 2924h.[13]

funds become available to the payee or endorsee as a matter of right. [¶] . . . However, the sale is subject to an automatic rescission for a failure of consideration in the event the funds are not 'available for withdrawal' as defined in Section 12413.1 of the Insurance Code. The trustee shall send a notice of rescission for a failure of consideration to the last and highest bidder submitting the check or alternative instrument, if the address of the last and highest bidder is known to the trustee. [¶] . . . [¶] (d) If the trustee has not required the last and highest bidder to deposit the cash, a cashier's check drawn on a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state, or a cash equivalent which has been designated in the notice of sale as acceptable to the trustee in the manner set forth in paragraph (2) of subdivision (b), the trustee shall complete the sale. If the last and highest bidder then fails to deliver to the trustee, when demanded, the amount of his or her final bid in cash, a cashier's check drawn on a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state, or a cash equivalent which has been designated in the notice of sale as acceptable to the trustee, that bidder shall be liable to the trustee for all damages which the trustee may sustain by the refusal to deliver to the trustee the amount of the final bid, including any court costs and reasonable attorneys' fees. [¶] If the last and highest bidder willfully fails to deliver to the trustee the amount of his or her final bid in cash, a cashier's check drawn on a state or national bank, . . . or if the last and highest bidder cancels a cashiers check drawn on a state or national bank, . . . that bidder shall be guilty of a misdemeanor punishable by a fine of not more than two thousand five hundred dollars ($2,500). [¶] *In the event the last and highest bidder cancels an instrument submitted to the trustee as a cash equivalent, the trustee shall provide a new notice of sale* in the manner set forth in Section 2924f and shall be entitled to recover the costs of the new notice of sale as provided in Section 2924c. [¶] . . . [¶] (f) In the event that this section conflicts with any other statute, then this section shall prevail. [¶] (g) It shall be unlawful for any person, acting alone or in concert with others, (1) to offer to accept or accept from another, any consideration of any type not to bid, or (2) to fix or restrain bidding in any manner, at a sale of property conducted pursuant to a power of sale in a deed of trust or mortgage. However, it shall not be unlawful for any person, including a trustee, to state that a property subject to a recorded notice of default or subject to a sale conducted pursuant to this chapter is being sold in an 'as-is' condition. [¶] In addition to any other remedies, any person committing any act declared unlawful by this subdivision or any act which would operate as a fraud or deceit upon any beneficiary, trustor, or junior lienor shall, upon conviction, be fined not more than ten thousand dollars ($10,000) or imprisoned in the county jail for not more than one year, or be punished by both that fine and imprisonment." (Italics added.)

[13] Moreover, independent of their analysis of the term "cash equivalent," respondents argued that subdivision (c) of section 2924h required that the sale be deemed rescinded because the funds submitted by them were not available for withdrawal. This argument seems fatuous on its face. While it is true that the funds were not available for withdrawal, such circumstance

The trial court concluded that the cashier's checks were "cash equivalents" as that term was used in section 2924h. As section 2924h provides that the remedy for the cancellation of a cash equivalent is the cost of renoticing a new sale, the trial court concluded California Golf was entitled to no further remedy. On that basis, the court granted summary adjudication in favor of the respondents on California Golf's complaint, and on the interpleader cause of action in Wells Fargo's cross-complaint. The court ruled that summary judgment in favor of the respondents, however, was not proper because Wells Fargo had not yet been discharged from the case.

Wells Fargo then filed a motion seeking (1) summary judgment, (2) an order that California Golf and the respondents be ordered to litigate their rights to the interpleaded funds, and (3) an order for, among other things, reasonable attorney's fees to be paid out of the interpleaded funds. Wells Fargo's motion was granted in full and it was awarded fees and costs in the sum of $33,791.23.[14]

California Golf then filed a cross-complaint against the respondents alleging a cause of action for breach of warranty. Additionally, California Golf pled causes of action against the respondents for fraud (alleging that they had conspired to have Perry Cooper present affidavits to Wells Fargo in which he falsely asserted that he had lost the cashier's checks), and for wrongful failure to conclude the trustee's sale.

The respondents generally demurred to California Golf's causes of action for breach of warranty and fraud, asserting that the trial court had already ruled that California Golf's sole remedy was to seek recovery of the cost of renoticing a foreclosure sale. The trial court sustained the demurrer to those causes of action, on law of the case grounds, without leave to amend.

With Wells Fargo out of the case, the remaining pending matters were California Golf's cause of action against the respondents for wrongful failure to conclude the trustee's sale, and the proper disposition of the interpleaded funds. By this time, California Golf had renoticed the foreclosure sale, and had sold the property at auction for $600,000. The respondents filed a motion

---

was due to respondents' own fraudulent inducement of Wells Fargo's stop payment action on the same day that the foreclosure sale was held. Respondents cannot now be heard to rely on such fund unavailability as a basis for a rescission of the sale.

[14] California Golf's notice of appeal specifically states that it does not challenge any rulings made in favor of Wells Fargo.

for summary judgment on California Golf's remaining cause of action and for distribution of the interpleaded funds to themselves. The respondents were awarded the interpleaded funds,[15] and a judgment was entered in their favor against California Golf in the amount of $14,415.16 (representing one-half of the fees and costs awarded to Wells Fargo, less California Golf's costs of renoticing the foreclosure sale). Thereafter, California Golf filed this timely appeal.

## CONTENTIONS

On appeal, California Golf argues that the trial court erred when it (1) granted summary adjudication in favor of respondents on California Golf's complaint; (2) sustained demurrers to California Golf's cross-complaint causes of action for breach of warranty and fraud; and (3) granted a summary judgment with respect to the remaining cause of action in California Golf's cross-complaint for the wrongful failure to conclude a trustee's sale. California Golf contends that the undisputed record in this case demonstrates that each of those causes of action has merit. We agree.

The respondents seek to avoid liability by relying on two arguments. First, they note that the earlier judgment for *judicial foreclosure* granted in favor of California Golf's predecessor in interest constitutes an election of remedies binding on California Golf. Second, they contend that section 2924h limits the remedy available to California Golf for a "cancelled" sale to the costs of publishing a new notice of sale. For the reasons discussed below, we reject both of these arguments.

## DISCUSSION

### 1. *Standards of Review*

Interpretation of statutes and the sufficiency of pleadings are both questions of law and we review those matters de novo. (*Coopers & Lybrand v.*

---

[15] Under California Uniform Commercial Code section 3312, after a bank waits until the claim of the individual filing the declaration of loss becomes enforceable, the bank is obligated to pay the amount of the check to the claimant, if the check has not otherwise been paid to a person entitled to enforce the check. (Cal. U. Com. Code, § 3312, subd. (b)(4).) If the bank pays the check to the claimant under those circumstances, and the check is *then* presented to the bank for payment "by a person having rights of a holder in due course, the claimant is obliged to (i) refund the payment to the obligated bank if the check is paid, or (ii) pay the amount of the check to the person having rights of a holder in due course if the check is dishonored." (Cal. U. Com. Code, § 3312, subd. (c).) While this subdivision does not apply to these precise circumstances, as the bank's "payment" to the claimant was the result of the trial court's decision in interpleader and the checks had already been dishonored by the bank, it is apparent from this subdivision that the right to payment of a holder in due course is greater than the right of a claimant who has filed a false declaration of loss.

*Superior Court* (1989) 212 Cal.App.3d 524, 529 [260 Cal.Rptr. 713].) In reviewing a demurrer, we accept as true the properly pleaded allegations of fact in the complaint, but not the contentions, deductions or conclusions of fact or law. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) We consider matters which may be judicially noticed, and we "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Ibid.*) We do not concern ourselves with whether California Golf will be able to prove the facts which it alleges in the complaint. (*Parsons v. Tickner* (1995) 31 Cal.App.4th 1513, 1521 [37 Cal.Rptr.2d 810].)

We review, on a de novo basis, the order granting the respondents' motion for summary judgment. (*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 474 [261 Cal.Rptr. 735].) In doing so, we apply the same rules the trial court was required to apply in deciding the motion. Because the respondents were the moving parties on California Golf's cross-complaint, they had the burden of demonstrating as a matter of law, with respect to California Golf's remaining cause of action for their failure to conclude trustee's sale, that one or more elements of the cause of action could not be established, or that there was a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).) Code of Civil Procedure, section 437c, subdivision (c), states that summary judgment is properly granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Because a summary judgment denies the adversary party a trial, it should be granted with caution. (*Michael J. v. Los Angeles County Dept. of Adoptions* (1988) 201 Cal.App.3d 859, 865 [247 Cal.Rptr. 504].)

2. *The Doctrine of Election of Remedies Does Not Bar California Golf's Claims*

Citing *Vlahovich v. Cruz* (1989) 213 Cal.App.3d 317 [261 Cal.Rptr. 565], the respondents assert that the doctrine of election of remedies supports a judgment in their favor. In *Vlahovich,* the court held it was unfair *to the trustor* if the beneficiary of a trust deed first obtains a judgment for judicial foreclosure and then later seeks to modify the judgment to allow for a nonjudicial foreclosure sale. The court stated that with a judgment for judicial foreclosure, the *debtor* may make efforts to secure the funds to exercise its right of redemption, and if the beneficiary is permitted to then seek nonjudicial sale, the debtor's right of redemption is precluded. The *Vlahovich* court cited *Roam v. Koop* (1974) 41 Cal.App.3d 1035 [116 Cal.Rptr. 539], where the plaintiff had asserted both contract and tort causes of action, pursued a

writ of attachment and levied on property, and then pursued the tort cause of action in a jury trial. Addressing the defense of election of remedies, the *Roam* court stated that when a party performs an act in pursuit of a remedy and thereby gains an advantage over the other *party* or causes that other *party* damage, he will be held to have elected a remedy and will not be permitted to pursue another remedy. (*Id.* at pp. 1039–1040.) The respondents also cite *O'Neil v. General Security Corp.* (1992) 4 Cal.App.4th 587, 602 [5 Cal.Rptr.2d 712], where persons who had obtained a monetary judgment on a promissory note were deemed to have forfeited their right to pursue the trust deed that secured the note.

In this case, however, the respondents are not entitled to claim the benefit of the doctrine of election of remedies, given that they were not a trustor or debtor under the trust deed that was addressed in the prior suit brought by California Golf's predecessor. As the respondents were neither trustors nor debtors under the foreclosed trust deed, they are in no position to complain about the manner or means of actual foreclosure. They were *bidders* at the foreclosure sale and whether that proceeding arose from a judicial foreclosure or a nonjudicial one was of no concern to them as long as they received a valid trustee's deed to the property.

A review of the extensive treatment in 3 Witkin, California Procedure (4th ed. 1996) Actions, section 174 et seq., page 243 et seq. on the doctrine of election of remedies shows that the doctrine is applied to benefit a party that was a *defendant* in the action in which the plaintiff had elected a remedy, and the doctrine is applied either (1) under the principle of res judicata to prevent a subsequent suit between the same parties on the same cause of action (*id.*, § 180, pp. 251–252) or (2) under the principle of equitable estoppel to prevent prejudice (injury) to that defendant in the original suit (*id.*, § 181 et seq., p. 252 et seq.). Here, the respondents were not parties in the prior judicial foreclosure suit, so the doctrine of res judicata is not available to them, nor can they claim that they will suffer any damage *because* this nonjudicial foreclosure sale followed an action for judicial foreclosure. Thus, we do not find that the respondents' defense of election of remedies has any merit in the context of the facts of this case.

We also reject respondents' contention that, since California Golf ultimately renoticed the foreclosure sale and disposed of the property in a new foreclosure sale, it has *now* elected a remedy that is inconsistent with its claim that respondents' purchase obligation should be enforced. At most, such sale simply *mitigates* the damages that California Golf may recover from respondents in this case. "The doctrine of election of remedies is but a specific

application of the equitable doctrine of estoppel, and it has been frequently held that a change in remedies does not bring about an election of remedies unless the change involves a prejudice to the opposing party." (*Commercial Centre R. Co. v. Superior Court* (1936) 7 Cal.2d 121, 129 [59 P.2d 978].) Here, the respondents have not asserted prejudice from the sale of the property. Indeed, if California Golf prevails on its cross-complaint, the respondents will have been placed in a better position than they would be in if the property had not been sold, since the damages allegedly suffered by California Golf may have been reduced by such sale.

### 3. *Section 2924h Does Not Preclude California Golf's Claims*

As noted above, California Golf alleged causes of action against respondents for breach of warranty under California Uniform Commercial Code (hereafter, simply Commercial Code) section 3312 and fraud. We focus here primarily, but not exclusively, on the cause of action for breach of warranty. It is apparent that California Golf alleges a sufficient cause of action on that basis. Thirteen cashier's checks were made out to Perry Cooper. In due course, Perry Cooper endorsed those checks to the trustee, who then deposited them in its account for California Golf's benefit. Cooper then signed, under penalty of perjury, 13 declarations of loss, falsely denying that the checks had been transferred, and instead asserting the loss of the checks. The elements for a cause of action for breach of warranty under Commercial Code section 3312 appear to be satisfied.

Respondents contend, however, and the trial court agreed, that California Golf can have no remedy for respondents' wrongdoing beyond that provided in section 2924h, subdivision (d). Respondents contend that a single sentence in that subdivision is controlling. That sentence provides, "In the event the last and highest bidder cancels an instrument submitted to the trustee as a cash equivalent, the trustee shall provide a new notice of sale . . . and shall be entitled to recover the costs of the new notice of sale . . . ." In other words, according to respondents, the cancellation of the cashier's checks obligated the trustee to provide a new notice of sale for which respondents had to pay the costs. Respondents contend that the remedy provided in subdivision (d) is exclusive and that California Golf is prohibited from any further recovery against them, no matter how tortious their conduct has otherwise been. Similarly, respondents contend that a criminal remedy set forth in section 2924h—specifically, a misdemeanor penalty for the cancellation of a cashier's check, bank check, or cash equivalent provided by the highest bidder at a nonjudicial foreclosure sale—also prevents California Golf from obtaining any further remedy.

■ We disagree. First, we conclude that a cashier's check is not a "cash equivalent" within the meaning of section 2924h. Therefore, the provisions relating to the remedy of obtaining the costs of renoticing the sale are simply not applicable. Second, we conclude that, although the statutory scheme governing nonjudicial foreclosures has, in certain circumstances, been held to constitute the exclusive civil remedy for wrongdoing in the context of a nonjudicial foreclosure, that exclusivity cannot be applied to immunize the fraudulent and apparently felonious conduct of respondents in this case. Finally, we conclude that while the misdemeanor penalty provided by section 2924h may be applicable, that criminal remedy is also not exclusive.

### a. *A Cashier's Check Is Not a "Cash Equivalent"*

We are here concerned with the interpretation of a single sentence in section 2924h, subdivision (d), which states: "In the event the last and highest bidder cancels an instrument submitted to the trustee as a *cash equivalent,* the trustee shall provide a new notice of sale in the manner set forth in Section 2924f and shall be entitled to recover the costs of the new notice of sale as provided in Section 2924c." (Italics added.) In accepting the argument of the respondents, the trial court necessarily ruled that the cashier's checks were "cash equivalents" for purposes of section 2924h.

■ In applying a statute, we first seek to determine the intent of the Legislature when it enacted the statute. If the intent is clear from the face of the statute, we need go no further in our search. (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) In addressing one legislative provision in a statutory scheme, we consider it "in the context of the statutory framework as a whole." (*Residential Capital v. Cal-Western Reconveyance Corp.* (2003) 108 Cal.App.4th 807, 821 [134 Cal.Rptr.2d 162].) "Where the construction of a statute is necessary, it should be interpreted so as to produce a result that is reasonable; the court must look to the context of the law and, where uncertainty exists, consideration should be given to the consequences that will flow from a particular interpretation." (*People ex rel. Riles v. Windsor University* (1977) 71 Cal.App.3d 326, 332 [139 Cal.Rptr. 378].) A construction of a statute that leads to an absurd consequence should be avoided. (*In re O'Neil* (1977) 74 Cal.App.3d 120, 123 [141 Cal.Rptr. 338].) Here, the plain language of the statute convinces us that the trial court erred in its interpretation of section 2924h.

The first thing one notices about the language of section 2924h is the repetition of certain words in subdivisions (b) and (d). Those words come first in subdivision (b) and we italicize them here: "(b) At the trustee's sale

the trustee shall have the right . . . to require every bidder to show evidence of the bidder's ability to deposit with the trustee the full amount of his or her final bid in [1] *cash,* [2] *a cashier's check drawn on a state or national bank,* [3] *a check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state, or* [4] *a cash equivalent which has been designated in the notice of sale as acceptable to the trustee* prior to, and as a condition to, the recognizing of the bid, and to conditionally accept and hold these amounts for the duration of the sale . . . ." (Italics added.) The whole of the above italicized language is stated twice in subdivision (b) and three times in subdivision (d). In each case, the four items described in the italicized language are set forth separately and disjunctively.

According to the trial court and the respondents, the term "cash equivalent" in the italicized language is a generic term that includes both the various methods of payment that precede the term "cash equivalent" and the additional methods of payment that a notice of sale states would be acceptable to the trustee. However, that reading of the italicized language essentially rewrites the statute by substituting the word "other" for the word "a" immediately before the term "cash equivalent" and makes the language read "or *other* cash equivalent which has been designated in the notice of sale as acceptable to the trustee." In making that substitution, a cashier's check then becomes just one of several "cash equivalents" that are mentioned in the italicized language.

Our reading of the italicized language, however, is entirely different. We read the language as written, without inserting an unwritten "other" into the statute. As written, "cash equivalent" is the fourth item in a disjunctive list in which the second item is "cashier's check," and there is simply no reason to conclude that this plain language means anything other than that the fourth item refers to something different from the second. The Legislature plainly used the words "cash equivalent" as a term of art in section 2924h to refer to something different from "cash," "cashier's check," or "check drawn by a [bank]." The term "cash equivalent" was clearly meant to designate *other* forms of payment which the trustee had found acceptable prior to the sale.

Our interpretation is buttressed when considered in connection with other subdivisions of section 2924h. Indeed, if respondents were correct, there would be no need to repeat the four-item disjunctive list four times in section 2924h following its initial introduction; the phrase "cash or cash equivalent"

would be sufficient. Repeating the entire list confirms that a cashier's check is not a cash equivalent. Moreover, we find it significant that, in section 2924h, subdivision (c), only two of the items on the list are mentioned. Subdivision (c) provides that a trustee may withhold the issuance of a trustee's deed to a successful bidder, "until funds become available to the payee or endorsee as a matter of right." That provision, however, only applies when the successful bidder has submitted, as a form of payment, "a check drawn by a credit union or a savings and loan association . . . or a cash equivalent designated in the notice of sale." By not including cashier's checks, the Legislature was clearly intentionally omitting them from this provision. The omission makes sense, as an implicit recognition of the fact that when cashier's checks are submitted as payment, the funds are immediately available to the trustee as a matter of right.

As we conclude that "cash equivalent" is a term of art that does not include cashier's checks, the disputed language of section 2924h, subdivision (d) providing for the recovery of the costs of renoticing the sale if "the last and highest bidder cancels an instrument submitted to the trustee as a cash equivalent" simply does not encompass the "stop payment" of cashier's checks submitted to the trustee as payment. Therefore, the trial court erred in holding that California Golf[16] can recover only the costs of renoticing the sale.

### b. *The Civil Remedies Provided by Section 2924h Are Not Exclusive*

Even if respondents were correct, however, in their assertion that California Golf has a remedy set forth in section 2924h, subdivision (d), this would not assist them since, contrary to their assertion, the remedies of section 2924h are not exclusive. Respondents rely on statements in three cases which, they argue, indicate that the Legislature intended to occupy the field of nonjudicial foreclosure sales and permit no further remedies. (*I. E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285 [216 Cal.Rptr. 438, 702 P.2d 596]; *Residential Capital v. Cal-Western Reconveyance Corp., supra,* 108 Cal.App.4th at p. 821; *Moeller v. Lien* (1994) 25 Cal.App.4th 822, 834 [30 Cal.Rptr.2d 777].) Before addressing the cases on which respondents rely, a brief overview of the purposes of the statutes governing nonjudicial foreclosure is appropriate.

---

[16] Also missing from respondents' analysis is the fact that the remedy of recovering the costs of renoticing the sale is provided by section 2924h to the *trustee,* not the foreclosing beneficiary. The statute is silent as to any remedies for the foreclosing beneficiary.

 " '[Civil Code s]ections 2924 through 2924k provide a comprehensive framework for the regulation of a nonjudicial foreclosure sale pursuant to a power of sale contained in a deed of trust.' [Citations.] This comprehensive statutory scheme has three purposes: ' "(1) to provide the creditor/beneficiary with a quick, inexpensive and efficient remedy against a defaulting debtor/trustor; (2) to protect the debtor/trustor from wrongful loss of the property; and (3) to ensure that a properly conducted sale is final between the parties and conclusive as to a bona fide purchaser." [Citations.]' [Citation.]" (*Melendrez v. D & I Investment, Inc.* (2005) 127 Cal.App.4th 1238, 1249–1250 [26 Cal.Rptr.3d 413].)

In each of the cases on which respondents rely, the court did not conclude that no remedies outside those provided by the nonjudicial foreclosure statutes are available simply because the Legislature intended to occupy the field. Instead, the court also considered the *policies* advanced by the statutory scheme, and whether those policies would be frustrated by the allowance of the additional remedy. (*I. E. Associates v. Safeco Title Ins. Co., supra,* 39 Cal.3d at pp. 288–289 [concluding that expanding the notice obligations of the trustee would not be supported by policy]; *Residential Capital v. Cal-Western Reconveyance Corp., supra,* 108 Cal.App.4th at pp. 827, 829 [declining to "graft[] a tort remedy onto a comprehensive statutory scheme in the absence of a compelling justification for doing so," and concluding that the addition of the proposed remedy would not fit within the comprehensive statutory scheme]; *Moeller v. Lien, supra,* 25 Cal.App.4th at p. 834 [concluding that "[i]t would be inconsistent with the comprehensive and exhaustive statutory scheme regulating nonjudicial foreclosures to incorporate another unrelated cure provision into statutory nonjudicial foreclosure proceedings"].)

It is clear, then, that the mere existence of a comprehensive statutory scheme does not necessarily eliminate all further remedies without the consideration of the relevant policy concerns. Indeed, California courts have repeatedly allowed parties to pursue additional remedies for misconduct arising out of a nonjudicial foreclosure sale when not inconsistent with the policies behind the statutes. In *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1231 [44 Cal.Rptr.2d 352, 900 P.2d 601], our Supreme Court concluded that a lender who obtained the property with a full credit bid at a foreclosure sale was not precluded from suing a third party who had fraudulently induced it to make the loan. The court concluded that " 'the antideficiency laws were not intended to immunize wrongdoers from the consequences of their fraudulent acts' " and that, if the court applies a proper measure of damages, " 'fraud suits do not frustrate the antideficiency policies because there should be no double recovery for the beneficiary.' " (*Id.* at p. 1238.) In *South Bay Building Enterprises, Inc. v. Riviera Lend-Lease, Inc.*

(1999) 72 Cal.App.4th 1111, 1121 [85 Cal.Rptr.2d 647], the court held that a junior lienor retains the right to recover damages from the trustee and the beneficiary of the foreclosing lien if there have been material irregularities in the conduct of the foreclosure sale. (See also *Melendrez v. D & I Investment, Inc., supra*, 127 Cal.App.4th at pp. 1257–1258; *Lo v. Jensen* (2001) 88 Cal.App.4th 1093, 1095 [106 Cal.Rptr.2d 443] [a trustee's sale tainted by fraud may be set aside].)

Considering the policy interests advanced by the statutory scheme governing nonjudicial foreclosure sales, and the policy interests advanced by Commercial Code section 3312, it is clear that allowing a remedy under the latter does not undermine the former. Indeed, the two remedies are complementary and advance the same goals. The first two goals of the nonjudicial foreclosure statutes: (1) to provide the creditor/beneficiary with a quick, inexpensive and efficient remedy against a defaulting debtor/trustor and (2) to protect the debtor/trustor from a wrongful loss of the property, are not impacted by the decision that we reach. This case most certainly, however, involves the third policy interest: to ensure that a properly conducted sale is final between the parties and conclusive as to a bona fide purchaser. This policy consideration is advanced by the fact that, under the statutory scheme, a bid at a foreclosure sale constitutes an "an irrevocable offer" to purchase the property for the amount of the bid. (§ 2924h, subd. (a); *Alliance Mortgage Co. v. Rothwell, supra*, 10 Cal.4th at p. 1237.) It is similarly advanced by the fact that, under the statutory scheme, once the bid is accepted, the sale is complete. (§ 2924h, subd. (c); *Angell v. Superior Court* (1999) 73 Cal.App.4th 691, 699–701 [86 Cal.Rptr.2d 657]; *Ballengee v. Sadlier* (1986) 179 Cal.App.3d 1, 4–5 [224 Cal.Rptr. 301].) It is *further* advanced by the fact that, under the statutory scheme, bidders are required to pay their bids in cash, cashier's checks, or bank checks. Certain "cash equivalents," such as personal checks, can be accepted only if the trustee so designates in the notice of sale. The statutory scheme envisions payment by means of cash, cashier's checks, or bank checks in an apparent attempt to guarantee that the acceptance of the highest bid will, in fact, result in funds in that amount actually being transferred.

Similarly, the Commercial Code is concerned with guaranteeing the validity and collectability of cashier's checks. Purchasers of cashier's checks have no right to stop payment on them. If a bank wrongfully refuses to pay a cashier's check, the holder is entitled to compensation which may include consequential damages. (Com. Code, § 3411.) A purchaser of a cashier's check can file a declaration of loss, but only under penalty of perjury. (Com. Code, § 3312, subd. (a)(3).) Even when such a declaration is made, it has no effect until 90 days after the date of the check, and the bank may pay on the

check in the interim, with no risk of liability. (Com. Code, § 3312, subd. (b)(1).) If the bank repays the purchaser who has filed a declaration of loss, the purchaser is then obliged to pay the amount of the check when a holder in due course presents it. (Com. Code, § 3312, subd. (c).) The warranty made by a declaration of loss expressly flows to any person entitled to enforce the check. (Com. Code, § 3312, subd. (b).)

The Commercial Code provisions governing cashier's checks are entirely compatible with the Civil Code sections governing nonjudicial foreclosures. Cashier's checks are a preferred form of payment in nonjudicial foreclosure sales precisely because they are readily negotiable and come with a bank's guarantee of payment. For this reason, they advance the goal of achieving finality of properly conducted foreclosure sales. Reading the nonjudicial foreclosure statutes' references to cashier's checks *without* also considering the Commercial Code sections relating to cashier's checks empties those references of meaning. There would be no point in preferring cashier's checks as payment at nonjudicial foreclosure sales if cashier's checks could be cancelled as freely as could, say, personal checks. Cashier's checks are preferred because they are as good as cash; cashier's checks are as good as cash because of provisions such as Commercial Code section 3312. Allowing California Golf to proceed with a cause of action against respondents for violating section 3312 is not contrary to the policies underlying the nonjudicial foreclosure statutes; instead, it supports those policies. The statutory remedies of section 2924h provide no bar to California Golf's pursuit of a cause of action against respondents for breach of warranty under Commercial Code section 3312. The analysis and result are the same with respect to California Golf's fraud cause of action.

Respondents assert that they "stop[ped] payment" on the cashier's checks due to alleged fraudulent misrepresentations which had induced them to bid too much for the property. If respondents were the victims of fraud in the sale, their remedy was to properly pursue their judicial remedies for fraud, not to engage in "self-help" by intentionally and fraudulently filing affidavits of loss in order to frustrate a trustee's sale which had already been completed.

### c. *The Criminal Remedies Are Not Exclusive*

■ Respondents suggest that, in addition to requiring the sale to be renoticed at their expense, section 2924h also provides for a *criminal* remedy, which, together with the costs of renoticing the sale, is exclusive. Subdivision (d) of section 2924h provides that "if the last and highest bidder cancels a cashier[']s check drawn on a state or national bank, a check drawn by a state

or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state, or a cash equivalent that has been designated in the notice of sale as acceptable to the trustee, that bidder shall be guilty of a misdemeanor punishable by a fine of not more than two thousand five hundred dollars ($2,500)." While it appears that this language would apply to respondents' conduct in obtaining a "stop payment" on the cashier's checks,[17] we do not see how this aids their argument about remedial exclusivity. Indeed, the $2,500 misdemeanor penalty applies to the cancellation of many different kinds of instruments—including any cash equivalent acceptable to the trustee. While the cancellation of such items might not otherwise be subject to criminal prosecution, the cancellation of a cashier's check *by the means of a false declaration under penalty of perjury* appears to involve the commission of the felony of perjury, punishable with two, three, or four years' imprisonment.[18] (Pen. Code, §§ 118, 126.) Surely, the existence of a potential misdemeanor penalty, as provided for in section 2924h, subdivision (d), would not foreclose prosecution for felony perjury simply because the defendant's allegedly perjurious conduct happened to also constitute the cancellation of a cashier's check in a nonjudicial foreclosure sale, and respondents do not so argue. Similarly, it would likewise not foreclose California Golf from pursuing remedies in tort for respondents' fraudulent conduct, simply because that conduct happened to occur in the course of a nonjudicial foreclosure sale.

---

[17] While the statute speaks of the "cancel[lation of] a cashier[']s check," we recognize that it is not, strictly speaking, possible to stop payment on a cashier's check. (*Seman v. First State Bank of Eden Prairie* (Minn.App. 1986) 394 N.W.2d 557, 559.) A bank may *voluntarily* agree with the purchaser not to pay a cashier's check, although the Commercial Code imposes penalties on a bank wrongfully refusing to pay a cashier's check in order to discourage the practice. (See Com. Code, § 3411; Official Comments on U. Com. Code, Deering's Ann. Cal. U. Com. Code (1999 ed.) foll. § 3411, pp. 463–464.) In this case, we assume the term "cancels a cashier[']s check" includes the inducement of the bank to not pay a cashier's check, whether by voluntary agreement or declaration of loss.

[18] A criminal prosecution for perjury must be commenced "within four years after discovery of the commission of the offense, or within four years after the completion of the offense, whichever is later." (Pen. Code, § 801.5; see § 803, subd. (c)(2).) The false affidavits were completed by Perry Cooper on January 14, 2005. Thus, as of the date that this opinion is filed, the statute has not yet run on any possible prosecution against Perry Cooper for perjury, and the remaining respondents for conspiracy to commit perjury. (See Pen. Code, § 182.) Based on the undisputed record before us, we are both surprised and puzzled by the trial court's seeming indifference to this apparent criminal conduct. It is our intention to refer this case to the District Attorney of Los Angeles County for further investigation.

### 4. *The Trial Court Erred When It Sustained the Respondents' Demurrer, Granted a Final Judgment in Their Favor, and Apportioned Wells Fargo's Attorney's Fees*

The trial court granted summary adjudication to respondents with respect to California Golf's complaint, then sustained respondents' demurrer to the breach of warranty and fraud causes of action in California Golf's cross-complaint. Summary judgment was awarded respondents with respect to California Golf's cause of action for wrongful failure to complete the trustee's sale, crediting it only with the cost of renoticing the sale. Each of these rulings was based on the determination that California Golf's sole remedy against the respondents was the cost of renoticing the foreclosure sale. Since we have determined that California Golf's remedy is not so limited, each of these rulings was error. We will order that the trial court vacate those orders. Additionally, the trial court must vacate its order apportioning Wells Fargo's attorney's fees between California Golf and the respondents, since such order depends on the trial court's ultimate determination of the issues raised by California Golf's cross-complaint. Moreover, on this record, the trial court's order releasing the interpleaded funds to the respondents was clear error, as respondents had demonstrated no entitlement thereto. We will direct the trial court to issue an order requiring the immediate restoration of those funds to the custody of the court, to be held and disbursed after a *final* determination of the extent of the parties' respective entitlement thereto.

## DISPOSITION

The judgment from which California Golf has appealed is reversed and the cause is remanded with directions requiring that the trial court (1) vacate its orders sustaining the demurrer and granting summary judgment and adjudication with respect to California Golf's complaint and cross-complaint and issue new orders overruling the demurrer and denying the motions for summary judgment and adjudication, (2) vacate its order apportioning the attorney's fees ordered paid to Wells Fargo, (3) issue an order requiring the respondents, and each of them, to forthwith return the interpleaded funds to the custody of the court;[19] and (4) conduct such further proceedings as may be appropriate and not inconsistent with the views expressed herein. California Golf shall recover its costs on appeal.

---

[19] In light of California Golf's subsequent sale of the property, the parties may be able to agree on the amount at issue in this matter. If so, the trial court may accept the parties' written stipulation (or agreement orally recited in open court) as to the exact amount to be restored to court custody. Alternatively, if the parties cannot agree as to the amount remaining at issue, the court may determine that amount on appropriate motion.

The clerk of this court is directed to forward a copy of this opinion to the District Attorney of Los Angeles County for such investigation and action as he may deem appropriate.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied June 24, 2008, and respondents' petition for review by the Supreme Court was denied September 17, 2008, S165193.