[No. A133071. First Dist., Div. Two. Dec. 13, 2012.]

ALLEN PFEIFER et al., Plaintiffs and Appellants, v. COUNTRYWIDE HOME LOANS, INC., et al., Defendants and Respondents.

**COUNSEL**

Moss & Murphy and Glen L. Moss for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Brian E. Nelson and Travis LeBlanc, Special Assistant Attorneys General, Frances T. Grunder, Assistant Attorney General, Benjamin G. Diehl, Todd I. Espinosa, Samuel J. Maselli and Amy Teng, Deputy Attorneys General, as Amicus Curiae on behalf of Plaintiffs and Appellants, upon the request of the Court of Appeal.

Bryan Cave, James Goldberg and Berrie Goldman for Defendants and Respondents.

Severson & Werson, Jan T. Chilton and Jon D. Ives for Wells Fargo Bank as Amicus Curiae on behalf of Defendants and Respondents.

**OPINION**

**LAMBDEN, J.**—Allen Pfeifer (Allen) and Florence A. Pfeifer (Florence), a son and his mother (collectively, the Pfeifers), have a mortgage insured by the Federal Housing Administration (FHA). They filed a third amended complaint against Countrywide Home Loans, Inc. (Countrywide), and ReconTrust Company (Recon) after a nonjudicial foreclosure proceeding was commenced against their property. The trial court sustained a demurrer by Countrywide and Recon (collectively, the lenders) without leave to amend against the Pfeifers' third amended complaint and then entered judgment in favor of the lenders.

The Pfeifers appeal and challenge the trial court's rulings that they did not have a cognizable legal claim against Recon under the federal Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq.; FDCPA or the Act). They also challenge, among other things, the trial court's denial of their requests for declaratory relief and for wrongful foreclosure based on the lenders' failure to conduct a face-to-face interview as mandated by the servicing regulations of the Department of Housing and Urban Development (HUD).

We conclude that the deed of trust incorporates by reference the servicing requirements of HUD, including the face-to-face interview, and the lenders had to comply with the servicing terms prior to conducting a valid nonjudicial foreclosure. We also hold that tender is not required in the present situation, because the borrowers are seeking to enjoin a pending foreclosure sale based on the lenders' failure to comply with the servicing requirements incorporated in the FHA deed of trust. Although we agree with those courts that refuse to permit any private right of action for failure to comply with the HUD regulations and the Pfeifers cannot seek damages based on their wrongful foreclosure action, we concur with those courts distinguishing an offensive action from a defensive action. Thus, we conclude that the servicing requirements are conditions precedent to the acceleration of the debt or to foreclosure. Consequently, the Pfeifers may seek to enjoin the lenders from proceeding with a nonjudicial foreclosure based on the lenders' failure to perform a HUD servicing requirement.

Accordingly, we reverse the trial court's judgment as to the Pfeifers' request for injunctive relief based on their wrongful foreclosure claim and their request for declaratory relief. We, however, otherwise affirm the trial court's judgment, including the lower court's ruling that the Pfeifers do not have a claim for damages against Recon for violating the FDCPA, because Recon is not a debt collector under the statute.

## BACKGROUND

On August 31, 2009, the Pfeifers filed a complaint against the lenders to enjoin a foreclosure, for declaratory relief, for an accounting, and for elder abuse.[1] The Pfeifers filed a first amended complaint, and the lenders demurred. On June 28, 2010, the trial court sustained the lenders' demurrer with leave to amend the Pfeifers' pleading. The Pfeifers filed a second amended complaint and, after obtaining new counsel after the death of their original attorney, received the court's permission to file a third amended complaint.

The Pfeifers filed their third amended complaint on January 25, 2011, which set forth the following seven causes of action: breach of the implied covenant of good faith and fair dealing against the lenders, wrongful foreclosure against the lenders, breach of contract against the lenders, fraud and deceit against the lenders, a violation of the FDCPA against Recon, financial elder abuse against Countrywide, and a request for declaratory relief against the lenders. The Pfeifers requested, among other things, general and punitive damages as well as an order canceling the notice of default and notice of trustee sale.

In their pleading, the Pfeifers alleged that they owned property in Hayward, California, and that Florence is the mother of Allen. The pleading asserted that Florence was incompetent and suffered from Alzheimer's disease and that the original lender knew, or reasonably should have known, that Florence was incompetent and unable to provide consent to a loan agreement. In May 2011, Allen was appointed as guardian ad litem to represent the interests of his mother.

The Pfeifers had a mortgage insured by the FHA. The note indicated that on April 25, 2008, the Pfeifers borrowed $606,977 at 6.125 percent interest from Alameda Mortgage Corporation (Alameda Mortgage). The monthly payment was $3,688.06. The deed of trust was filed on April 30, 2008.

According to the Pfeifers' third amended complaint, Countrywide purchased the loan made by Alameda Mortgage in the principal amount of $606,977, but this transaction "was a sham and fictitious one." This loan was secured by the Pfeifers' home in Hayward. The Pfeifers alleged that Alameda Mortgage "was essentially a front for Countrywide. Alameda Mortgage was

---

[1] On September 3, 2009, the trial court denied the Pfeifers' application for a preliminary injunction.

only the nominal lender and did not use its own money to make the loan. Instead, it used the money from Countrywide and the entire transaction was premised on the fact that Countrywide would promptly become the owner of the loan, and would then securitize it. Countrywide set the terms of the deal and enforced all the underwriting standards and guidelines." The pleading stated that Alameda Mortgage was a dual agent of both Countrywide and them. Bank of America purchased Countrywide, and Bank of America received the servicing rights of the Pfeifers' loan.[2]

After Countrywide declared the Pfeifers' loan in default, Countrywide, according to the Pfeifers' third amended complaint, retained Recon to collect the debt. The third amended complaint stated that Recon became the trustee of the deed of trust after the Pfeifers defaulted on their obligations. The Pfeifers alleged that Recon was a "debt collector" as used in FDCPA. They further asserted that Mortgage Electronic Registration Systems, Inc. (MERS), a Delaware corporation, was the "nominee beneficiary of the subject loan" but did not have any beneficial interest in the loan. MERS, according to the pleading, is a subsidiary of MERSCORP, a Reston, Virginia, corporation. These corporations, the Pfeifers asserted, failed to register to do business in California.

On May 13, 2009, Recon recorded a notice of default. The notice of default stated pursuant to Civil Code section 2924, subdivision (c) the following: "Upon your written request the beneficiary . . . will give you a written itemization of the entire amount you must pay." The notice of default also stated that at this time the Pfeifers owed $27,313.25 to reinstate their loan.

The Pfeifers claimed in their third amended complaint that on May 13, 2009, Recon recorded the notice of default prior to providing them with the 30-day advance debt validation notice required by the FDCPA. If they had received proper notice, they would have been able to explain, according to their pleading, that a truck had collided with their property and that they had collected checks in the amounts of $13,844.99, $637, and $314 (for a total of $14,795.99) in damages, which could have been credited to their mortgage. They declared that Countrywide failed to credit them with this money and unlawfully kept the money. They maintained that Countrywide also received $4,691 for mortgage payments that were not properly credited to their mortgage. Additionally, the Pfeifers asserted, "Countrywide unlawfully 'force placed' insurance thereby wrongfully charging [their] account approximately $637.00." They alleged that they had adequate insurance at all relevant times.

---

[2] The Pfeifers noted that they did not know the identity of the actual investor owning the underlying note and deed of trust and requested such information under title 15 United States Code section 1641.

They averred that Recon had a mandatory duty under the FDCPA to investigate these accounting problems and correct them prior to recording a notice of default. Furthermore, they stated that Recon was not entitled to any immunity from suit and was not entitled to claim "any bona fide error defense for failure to comply with debt validation procedure in the FDCPA."

With regard to their second cause of action, wrongful foreclosure, the Pfeifers alleged, among other things: "The instant loan is insured by the [FHA] and is subject to the pre-foreclosure requirements provided by the FHA. These requirements include a requirement of a face-to-face interview between an agent of the lender and the borrower prior to commencing any foreclosure proceedings. The scope of this interview is summarized in [title 24 Code of Federal Regulations part] 203.604(b), which is incorporated by reference. Defendants have breached this obligation and prematurely commenced a foreclosure proceeding. Plaintiffs are entitled to the cancellation of the notice of default and notice of sale until defendants comply with these regulations. These regulations have the force of law and may be enforced by the borrowers. . . ." The Pfeifers asserted that they were "entitled to a restraining order to stop the nonjudicial foreclosure proceedings and to compel defendants to meet their obligations under federal" law.

The lenders requested that the trial court take judicial notice of the note, deed of trust, notice of default and election to sell under the deed of trust, and the notice of the trustee's sale, which had been referenced in the Pfeifers' third amended complaint. They also requested judicial notice of the substitution of trustee filed in the Alameda County official records.

The first page of the deed of trust identifies the deed of trust as an "FHA California Deed of Trust." Paragraph 9 in the deed of trust sets forth the "grounds for acceleration of debt." When a default occurs, this paragraph provides under subdivision (a) that the "[l]ender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if: [¶] (i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or [¶] (ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument." Subdivision (b) states under "sale without credit approval," that the "[l]ender shall, if permitted by applicable law . . . and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument . . . ." In subdivision (d), under the heading of "Regulations of HUD Secretary," the agreement reads as follows: "In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in

full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary."

Paragraph 4 in the deed of trust sets forth the application of insurance proceeds to the principal balance. It provides that in the event of loss, "[a]ll or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in paragraph 2, or change the amount of such payments. . . ."

The notice of default and election to sell under the deed of trust filed May 13, 2009, provided in relevant part: "IF YOUR PROPERTY IS IN FORE-CLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account . . . ." The notice provided that "[t]his amount is $27,313.25, as of 05/11/2009 and will increase until your account becomes current." The notice further provided the following: "Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay."

On June 27, 2011, the trial court sustained the lenders' demurrer to the Pfeifers' third amended complaint without leave to amend. The court explained: "First, it appears that there was no requirement in the deed of trust that insurance proceeds be applied to the mortgage principal in lieu of monthly payments. Next, plaintiffs appear to concede through no stated opposition that any claim under California Civil Code section 2923.5 fails because the statute is inapplicable to plaintiffs' deed of trust. Further, there is no statutory duty to modify a loan under California Civil Code section 2923.6. Moreover, the federal loan/modification programs on which plaintiffs rely do not appear to offer a private right of action or designate borrowers in plaintiffs' situation as third-party beneficiaries. In addition, it appears that the named beneficiary, MERS, has the right to foreclose on the property, assign its rights and/or make a substitution of trustee. [Citations.] [¶] In order to maintain any claim based on a purported irregularity in the foreclosure sale procedure, plaintiffs are required to allege tender of the amount owed on the secured debt. [Citation.] Plaintiffs fail to adequately allege tender." The court also noted that the Pfeifers failed to state sufficient facts to support a claim of financial elder abuse.

On July 6, 2011, the court entered judgment in favor of the lenders and stated that the Pfeifers "shall take nothing by their" third amended complaint against the lenders. The Pfeifers filed a timely notice of appeal.

On May 1, 2012, this court on its own motion issued the following order: "The parties are to provide supplemental briefs to address the reasoning in a recent Virginia case, *Mathews v. PHH Mortgage Corp.* (2012) [283 Va. 723] [724 S.E.2d 196] on the issues raised on appeal. Additionally, the parties are to address whether paragraph 9 in the deed of trust was a negotiated provision and discuss any significance of this issue. Any argument *must* be supported with citations to the record and explain how the third amended complaint may or may not be amended to address this issue. No other issue may be raised in the supplemental brief. . . ."

On May 11, 2012, this court issued the following order: "The [California] Attorney General is hereby accorded amicus curiae status and is invited to submit an amicus brief on behalf of appellants Allen and Florence Pfeifer. Any such brief should be served and filed by June 15, 2012, and should respond to the cases cited in respondent's brief, filed on February 17, 2012. We have requested the parties to submit supplemental briefing that will be filed during the month of May 2012, and the supplemental briefs will address why this court should not adopt the analysis of *Mathews v. PHH Mortgage Corp.*[, *supra*, 724 S.E.2d 196]. Any amicus brief the Office of Attorney General chooses to file should likewise address the analysis employed in said case. Any party may serve and file an answer to the amicus brief within 25 days after it is filed. . . ."

The parties filed supplemental briefs and the California Attorney General (the Attorney General) filed an amicus curiae brief on July 16, 2012. The lenders filed a response to the amicus curiae brief on August 9, 2012. On August 10, 2012, we granted the unopposed application by Wells Fargo Bank, N.A. (Wells Fargo), for permission to file an amicus curiae brief in support of the lenders. No response was filed to Wells Fargo's amicus curiae brief.

## DISCUSSION

### I. *Standard of Review*

The standard of review governing an appeal from the judgment after the trial court sustains a demurrer without leave to amend is well established. " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we

give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

## II. *Claim That Recon Violated the FDCPA*

The fifth cause of action in the Pfeifers' third amended complaint alleges a violation of the FDCPA against Recon. The Pfeifers concede that Recon is not liable for any claim against them as a debt collector under California law, but assert that the state law is preempted by the FDCPA (15 U.S.C. § 1692) and Recon is liable for its unfair debt collection under the federal law.

The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." (15 U.S.C. § 1692(e).) The word " 'creditor' means any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." (15 U.S.C. § 1692a(4).) "The term 'debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." (15 U.S.C. § 1692a(5).)

The FDCPA defines " 'debt collector' " as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. . . . [T]he term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. . . ." (15 U.S.C. § 1692a(6).)

In order to establish a claim under the FDCPA against Recon, the facts as alleged must show that Recon was a "debt collector" as defined by

the Act, that Recon's challenged conduct constituted "debt collection," and that the debt collection actions violated a provision of the Act. (See, e.g., *Heintz v. Jenkins* (1995) 514 U.S. 291, 294 [131 L.Ed.2d 395, 115 S.Ct. 1489].) In their pleading, the Pfeifers allege that Countrywide retained Recon to collect the debt after Countrywide declared the Pfeifers' loan in default. They further declared that Recon became the trustee of the deed of trust and that Recon was a "debt collector" as used in the FDCPA. Recon mailed the Pfeifers the notice of default pursuant to Civil Code section 2924, subdivision (c), which stated that the Pfeifers owed $27,313.25 together with unspecified unpaid impound payments. Recon recorded a notice of default and filed the notice of trustee's sale.

The Pfeifers argue that Recon was a debt collector because it "was hired by the unknown owner of the note and deed of trust for the specific purpose of collecting an alleged default." It alleged that Recon "recorded a premature notice of default" prior to giving the Pfeifers the notice required by the FDCPA. They maintain that the opinion of the administrative agency responsible for enforcing the Act supports their argument that Recon was a debt collector under the FDCPA and courts should defer to the interpretation of a statute by the administrative agency responsible for enforcing that statute. (See, e.g., *Ford Motor Credit Co. v. Milhollin* (1980) 444 U.S. 555, 566 [63 L.Ed.2d 22, 100 S.Ct. 790] [the "general proposition" is "that considerable respect is due ' "the interpretation given [a] statute by the officers or agency charged with its administration" ' "].)

In support of their argument, the Pfeifers cite the amicus curiae brief by the Consumer Financial Protection Bureau (the Bureau) in *Birster v. American Home Mortgage Servicing, Inc.* (11th Cir. 2012) 481 Fed. Appx. 579, which is an appeal from *Birster v. American Home Mortgage Servicing, Inc.* (S.D.Fla. 2011) 796 F.Supp.2d 1376 (*Birster*). In its amicus curiae brief, the Bureau took an official position that trustees must comply with the entire FDCPA, and not merely title 15 United States Code section 1692f(6), in connection with a nonjudicial trustee sale.[3] Title 15 United States Code section 1692a(6) defines "debt collector" for this provision as any entity whose "principal purpose" is "the enforcement of security interests." Six categories of people/entities are specifically excluded from the definition of "debt collector," but enforcers of security interests do not appear on that list. The Bureau stated that it disagreed with the conclusion of some courts that enforcers of security interests qualify as debt collectors for purposes of title 15 United States Code section 1692a(6) and therefore cannot be debt collectors under the FDCPA. The Bureau stated that an entity satisfying both definitions of "debt collector" remains a "debt collector" subject to the entire FDCPA even if it is enforcing a security interest in a particular case.

---

[3] We took judicial notice of this amicus curiae brief.

The amicus curiae brief by the Bureau in *Birster* did not address whether the pursuit of a foreclosure, by itself, constitutes debt collection under the Act. In *Birster*, the challenged conduct related to the enforcement of a security interest and included attempts to collect overdue payments that included visiting the home and making harassing and threatening phone calls to induce payment of the debts. (See *Birster, supra*, 796 F.Supp.2d at p. 1377.) Thus, the Bureau's amicus curiae brief does not affect the authority that has concluded that acts required to institute foreclosure proceedings, alone, are not debt collection activities under the FDCPA. In *Santoro v. CTC Foreclosure Service* (9th Cir. 2001) 12 Fed.Appx. 476, the Ninth Circuit considered claims by mortgagors against the loan service company and foreclosure service company for alleged violations under the Act. The court explained that a foreclosure sale notice issued in compliance with Civil Code section 2924 et seq. does not seek to collect a debt and such notices are not the type of conduct that is forbidden under the Act.[4]

Similarly, in *Gonzalez v. CNA Foreclosure Service, Inc.* (S.D.Cal., June 29, 2011, No. 09 CV 2034 MMA (MDD)) 2011 WL 2580681, the court concluded that CNA Foreclosure Service, Inc. (CNA), was not a " 'debt collector' within the meaning of the FDCPA." (*Gonzalez*, at p. *3.) It held that a foreclosure sale notice issued in compliance with Civil Code section 2924 et seq. did not seek to collect a debt. (*Gonzalez*, at p. *3.) The court

---

[4] We note that federal courts have conflicting conclusions about the applicability of the FDCPA to the act of foreclosing. (Compare *Perry v. Stewart Title Co.* (5th Cir. 1985) 756 F.2d 1197, 1208 [holding that mortgagees are not debt collectors under the FDCPA] with *Wilson v. Draper & Goldberg, P.L.L.C.* (4th Cir. 2006) 443 F.3d 373, 376–377 [holding that a trustee sale is a debt collection under the FDCPA].) District courts in the Ninth Circuit have held that "foreclosing on a property pursuant to a deed of trust is not a debt collection within the meaning" of the FDCPA. (*Gamboa v. Trustee Corps & Central Mortgage Loan Servicing Co.* (N.D.Cal., Mar. 12, 2009, No. 09-007 SC) 2009 U.S.Dist. Lexis 19613, p. *11; see, e.g., *Izenberg v. ETS Services, LLC* (C.D.Cal. 2008) 589 F.Supp.2d 1193, 1199; *Hulse v. Ocwen Federal Bank, FSB* (D.Or. 2002) 195 F.Supp.2d 1188, 1204.)

In their supplemental brief, the Pfeifers argue that the deed of trust incorporates the foreclosure protections in the FDCPA. Our court order requesting supplemental briefing did not permit argument on this issue, and we therefore will not consider this argument. Furthermore, we note that no such allegation was set forth in the Pfeifers' third amended complaint.

The Pfeifers also cite, in their supplemental brief, *Reese v. Ellis, Painter, Ratterree & Adams, LLP* (11th Cir. 2012) 678 F.3d 1211, a case recently decided, to support their argument that they have a private right of action under the FDCPA. Since this case was decided *after* the original briefs were filed in this court, we will briefly address the applicability of this case to the Pfeifers' claim of an action under the FDCPA. In *Reese*, a law firm representing the lender sent the plaintiffs a letter and documents demanding payment. The documents specifically stated that the law firm " 'IS ATTEMPTING TO COLLECT A DEBT' " and that " 'THIS LAW FIRM IS ACING AS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT.' " (*Reese*, at p. 1217.) We thus conclude that *Reese* is clearly distinguishable from the present case; the Pfeifers have not alleged that there is any document from Recon that included collection demand language or an assertion by Recon that it was attempting to collect a debt other than the notice required under Civil Code section 2924.

found that "[t]he sole purpose of CNA's business is to act as a trustee for lenders to facilitate the foreclosure process. . . . All the information CNA includes in the notices regarding any amounts owed are provided by the lenders, CNA does not interact with the borrowers regarding the amounts owed, nor has CNA ever collected money on behalf of the lenders." (*Id.* at p. *4.)

■ The Pfeifers have alleged that Recon sent a notice of the pending foreclosure sale, but this allegation is insufficient to show that Recon engaged in debt collection activities bringing it under the ambit of the FDCPA. We agree with those courts that have held that giving notice of a foreclosure sale to a consumer as required by the Civil Code does not constitute debt collection activity under the FDCPA.[5]

We need not consider the Pfeifers' contention that the FDCPA creates a private cause of action for injunctive relief. Since we conclude that the Pfeifers have not made a claim under the FDCPA, we need not consider what remedies are available under this Act.

### III. *Foreclosing Without First Complying with the HUD Servicing Regulations*

#### A. *Introduction*

The Pfeifers have a mortgage insured by the FHA, and the terms of their note and mortgage subject the mortgage to the servicing requirements under HUD. In their pleading, the Pfeifers allege that the lenders began foreclosing on their property without adhering to the HUD servicing requirements, as they did not have a face-to-face interview with them as required by the Code of Federal Regulations.[6] (See 24 C.F.R. § 203.604 (2012); see also 24 C.F.R. § 203.500 (2012).) They maintain that the HUD regulations are conditions precedent that must be complied with prior to a mortgagee's having the right to foreclose. Consequently, they maintain that, as alleged in their pleading, they are entitled to a restraining order based on wrongful foreclosure and a court order declaring that any attempt to foreclose would be void as the lenders did not satisfy a condition precedent to foreclosure.

---

[5] The lenders argue that the Pfeifers' attempt to distinguish between debt collection and security interest enforcement is artificial. We need not consider whether there is a significant distinction for purposes of the FDCPA because, as already discussed, the only "debt collection" activity alleged by the Pfeifers is that Recon gave notice of a foreclosure as mandated by the Civil Code; thus, we conclude that Recon was not a debt collector under the Act.

[6] The Pfeifers allege that the lenders did not comply with the loss mitigation measures required by Civil Code section 2923.5, but their allegations regarding the lenders' failure to comply with the HUD servicing requirements is limited to the requirement of a face-to-face interview.

The lenders respond that they did not have to comply with the face-to-face servicing requirement. They assert that HUD regulations are concerned exclusively with the relations between the mortgagee and the government and do not create any duties to the borrower. They maintain that the Pfeifers are attempting to sidestep the well-settled holding that the federal regulations provide no private right of action for mortgagors. (See, e.g., *Roberts v. Cameron-Brown Co.* (5th Cir. 1977) 556 F.2d 356, 360.) Moreover, they argue that state law does not permit placing additional requirements onto the statutory nonjudicial foreclosure scheme. Additionally, they assert that even if the HUD loss mitigation requirements are conditions precedent, the face-to-face interview is not required. Moreover, the Pfeifers never paid or alleged that they would pay their entire loan and therefore, according to the lenders, they cannot claim wrongful foreclosure.

## B. *Relevant Law*

As already noted, the Pfeifers have a mortgage insured by the FHA. Congress created the FHA through the National Housing Act (NHA; 12 U.S.C. § 1701 et seq.). (See *Nehemiah Corp. of America v. Jackson* (E.D.Cal. 2008) 546 F.Supp.2d 830, 834.) In 1965, the FHA became a part of HUD and it is still a component of HUD. (*Nehemiah Corp.*, at p. 834, citing 42 U.S.C. § 3534(a).) HUD promulgated mortgage-servicing regulations under the authority granted to it by the NHA (12 U.S.C. § 1701 et seq.) in order to carry out its loan insurance programs. The NHA provides: "Upon default or imminent default . . . of any mortgage insured under this [title], mortgagees shall engage in loss mitigation actions for the purpose of providing an alternative to foreclosure . . . ." (12 U.S.C. § 1715u(a).)

Under the NHA, mortgagees are induced to make essentially risk-free mortgages by being guaranteed against loss in the event of default by the mortgagor. (*Anderson v. United States Dept. of Housing & Urban Development* (10th Cir. 1983) 701 F.2d 112, 113–114.) This program allows mortgagees to offer loans to low-income families at a more favorable rate than would otherwise be available in the market. (*Ibid.*) The availability of affordable mortgages, in turn, promotes Congress's "national goal" of " 'a decent home and a suitable living environment for every American family.' " (12 U.S.C. § 1701t.)

Pursuant to the authority conferred by Congress, HUD promulgated regulations pertaining to HUD-insured mortgages. The regulations regarding a mortgagee's servicing responsibilities of such mortgages are codified in title 24, part 203 (Single Family Mortgage Insurance) (capitalization omitted), subpart C (Servicing Responsibilities) of the Code of Federal Regulations (2012). (24 C.F.R. § 203.500 et seq. (2012).)

For mortgages insured by the FHA, servicers are required to follow servicing regulations mandated by the HUD Secretary before initiating foreclosure. (*Wells Fargo v. Neal* (2007) 398 Md. 705, 719–720 [922 A.2d 538, 546–547]; 12 U.S.C. § 1709 et seq.; 24 C.F.R. § 203.500 et seq. (2012).) Title 24 of the Code of Federal Regulations provides in pertinent part: "It is the intent of [HUD] that no mortgagee shall commence foreclosure or acquire title to a property until the requirements of this subpart have been followed." (24 C.F.R. § 203.500 (2012).) Elsewhere, the regulations require that "[b]efore initiating foreclosure, the mortgagee must ensure that all servicing requirements of this subpart have been met. . . ." (24 C.F.R. § 203.606(a) (2012).) Except in specific circumstances not relevant to the allegations set forth in the present case: "The mortgagee must have a face-to-face interview with the mortgagor, or make a reasonable effort to arrange such a meeting, before three full monthly installments due on the mortgage are unpaid. If default occurs in a repayment plan arranged other than during a personal interview, the mortgagee must have a face-to-face meeting with the mortgagor, or make a reasonable attempt to arrange such a meeting within 30 days after such default and at least 30 days before foreclosure is commenced . . . ." (24 C.F.R. § 203.604(b) (2012).)

## C. *The Deed of Trust*

The FHA deed of trust in the present case, at paragraph 9, sets forth the "grounds for acceleration of debt." When a default occurs, this paragraph provides under subdivision (a) that the "[l]ender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument . . . ." In subdivision (d), under the heading "Regulations of HUD Secretary," the agreement reads as follows: "In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary."

Paragraph 18 in the deed of trust includes a provision for appointment of a foreclosure commissioner to conduct the nonjudicial trustee sale if the loss mitigation provisions required by paragraph 9 are unsuccessful.

## D. *The Face-to-face Interview as a Condition Precedent*

### 1. *The Lenders' Obligations Under the FHA Deed of Trust*

The Attorney General in its amicus curiae brief and the Pfeifers contend that the above mentioned language in paragraph 9 of the deed of trust

requires compliance with the HUD regulations prior to initiating a foreclosure. "The rights and powers of trustees in nonjudicial foreclosure proceedings have long been regarded as strictly limited and defined by the contract of the parties and the statutes." (*I. E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 287 [216 Cal.Rptr. 438, 702 P.2d 596].)

■ "In contract law, 'a condition precedent is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises.' [Citation.] The existence of a condition precedent normally depends upon the intent of the parties as determined from the words they have employed in the contract. [Citation.]" (*Realmuto v. Gagnard* (2003) 110 Cal.App.4th 193, 199 [1 Cal.Rptr.3d 569].)

Here, the express language of paragraph 9 in the deed of trust states that the mortgagee is not authorized to foreclose on a property "if not permitted by" the HUD regulations. The HUD regulations require face-to-face meetings (24 C.F.R. § 203.604 (2012)) and, as alleged in the third amended complaint, such meetings did not occur in the present case. Additionally, as set forth above, the HUD regulations also specify that "no mortgagee shall commence foreclosure or acquire title to a property until" these HUD regulations have been followed. (24 C.F.R. § 203.500 (2012); see 24 C.F.R. § 203.606(a) (2012).)

The lenders and Wells Fargo in its amicus curiae brief argue that the duties under the regulations run to HUD, not the borrower. The lenders argue that paragraph 9 in the deed of trust, which governs acceleration and default, references regulations promulgated pursuant to a statute under which the Pfeifers have no private right of action and the Pfeifers are attempting to avoid the consequences of having no standing to assert a claim under the NHA. (See *Davies v. Sallie Mae, Inc.* (2008) 168 Cal.App.4th 1086, 1094–1096 [86 Cal.Rptr.3d 136].) The NHA "and the regulations promulgated thereunder deal only with the relations between the mortgagee and the government, and give the mortgagor no claim to duty owed nor remedy for failure to follow." (*Roberts v. Cameron-Brown Co., supra,* 556 F.2d at p. 360.) Thus, courts have refused to imply a private right of action under the NHA and its implementing regulations. (See *Moses v. Banco Mortgage Co.* (5th Cir. 1985) 778 F.2d 267, 272–273, fn. 2.) The lenders and Wells Fargo maintain that the Pfeifers' claim requires the court to interpret the regulations issued by the secretary under the NHA. Thus, according to the lenders and Wells Fargo, the Pfeifers are attempting to enforce provisions of the NHA and to use state contract law to circumvent Congress's choice not to grant a private right.

The question before us is not the enforcement of the regulations under the NHA and the lenders' duty to HUD. Rather, the issue is whether foreclosure is proper if the lender has not complied with the HUD servicing requirements as set forth in the FHA deed of trust. This does not require this court to enforce provisions of the NHA, but simply prevents a nonjudicial foreclosure when the borrower has an equitable defense based on the failure to comply with federal regulations designed to prevent foreclosures that are incorporated into the FHA deed of trust.

Courts have held that the HUD regulations, including the failure to make a reasonable attempt to conduct a face-to-face meeting with borrowers before initiating a foreclosure suit, are conditions precedent and must be followed before a mortgagee has the right to foreclose on a HUD-insured property. Courts have held that a mortgagee's noncompliance can be asserted as an affirmative defense or an equitable defense to a judicial foreclosure action. (See, e.g., *Lacy-McKinney v. Taylor, Bean & Whitaker Mortgage Corp.* (Ind.Ct.App. 2010) 937 N.E.2d 853, 864; *Wells Fargo v. Neal, supra,* 922 A.2d at pp. 543–544; *Washington Mutual Bank v. Mahaffey* (2003) 154 Ohio App.3d 44, 49–51 [2003 Ohio 4422, 796 N.E.2d 39, 42–44]; *Federal Land Bank of St. Paul v. Overboe* (N.D. 1987) 404 N.W.2d 445, 449; *Fleet Real Estate Funding Corp. v. Smith* (1987) 366 Pa.Super. 116, 121–124 [530 A.2d 919, 922–923]; *Bankers Life Co. v. Denton* (1983) 120 Ill.App.3d 576, 579 [76 Ill.Dec. 64, 458 N.E.2d 203, 205].)[7] These cases hold that the HUD regulations do not create an implied cause of action for damages, but may be used defensively as an affirmative defense to a judicial foreclosure action instituted by the creditor. (See, e.g., *Wells Fargo,* at pp. 543–544.) Thus, the court in *Wells Fargo* held that the mortgagor could not state an affirmative cause of action for breach of contract, but could raise a violation of the regulations in pursuit of an injunction blocking foreclosure. (*Id.* at p. 541.)

The lenders maintain that the foregoing cases are distinguishable because they did not involve nonjudicial foreclosures. The parties did not cite, nor did we locate, any California case directly addressing the issue raised by this appeal. This court, however, did locate a case from another jurisdiction, *Mathews v. PHH Mortgage Corp., supra,* 724 S.E.2d 196 (*Mathews*), which involved an FHA mortgagor, a claim that the deed of trust incorporated the HUD regulations and that the mortgagee failed to follow the regulations, and a *nonjudicial* foreclosure sale. We thus requested supplemental briefing by the parties to address the application and reasoning of *Mathews.*

---

[7] The Pfeifers also cite *Kersey v. PHH Mortgage Corp.* (E.D.Va. 2010) 682 F.Supp.2d 588. However, this opinion was vacated on August 13, 2010.

## 2. *The Reasoning of the Court in* Mathews

In *Mathews, supra,* 724 S.E.2d 196, the borrowers had an FHA loan and they sought declaratory relief that a pending foreclosure sale would be void based on the mortgagee's failure to carry out the face-to-face interview before initiating foreclosure. (*Id.* at p. 198.) The court noted that "[a] trustee's power to foreclose is conferred by the deed of trust" and "[t]hat power does not accrue until its conditions precedent have been fulfilled." (*Id.* at p. 199.) The deed of trust in *Mathews* contained the identical provisions as paragraphs 9 and 18 of the Pfeifers' deed of trust. The *Mathews* court noted that HUD requires that an FHA deed of trust state expressly that it " 'does not authorize acceleration or foreclosure if not permitted by the regulations of the Secretary.' " (*Mathews,* at p. 201, italics omitted.) The *Mathews* court observed that "[t]hese words 'are clear and unambiguous' " and that "[t]hey express the intent of the parties that the rights of acceleration and foreclosure do not accrue under the Deed of Trust unless permitted by HUD's regulations." (*Ibid.*) The court concluded that "the references to HUD's regulations in the Deed of Trust are sufficient to incorporate them insofar as they prevent the borrower from [the lenders'] accelerating or foreclosing." (*Ibid.*) The court reasoned that these regulations were enforceable by borrowers as conditions precedent to acceleration and foreclosure because HUD (24 C.F.R. § 203.17(a) (2012)) requires the language in paragraph 9 to be incorporated into FHA deeds of trust. (*Mathews,* at p. 202.)

## 3. *The Policies Underlying the HUD Servicing Requirements*

The lenders argue that the reasoning in *Mathews* is flawed. They maintain that the federal regulations required to be incorporated into the FHA deeds of trust are for HUD's benefit, to minimize HUD's losses, and are not to protect the consumers. (See 24 C.F.R. §§ 203.500, 203.501 (2012).)[8] The lenders discount the reasoning in *Mathews* partially because they claim that the *Mathews* court ignored the principal purpose of the HUD servicing requirements.

■ We agree that a principal purpose of the HUD regulations is to benefit HUD, and we agree with the reasoning of those courts that hold that the Pfeifers cannot bring a private right of action against the lenders. "The overall purpose of the FHA mortgage insurance program is to encourage leading lenders, in exchange for a government guarantee of the loan, to extend mortgages to those carrying higher credit risks. . . . Thus, the regulations do not control directly the relationship between the mortgagor and

---

[8] All further unspecified code sections refer to title 24 of the Code of Federal Regulations.

mortgagee and may not be invoked by the mortgagor as a sword in an offensive cause of action against the mortgagee." (*Wells Fargo v. Neal, supra,* 922 A.2d at p. 546.)

The lenders, however, discount that another goal of the HUD servicing regulations is to prevent foreclosure in HUD mortgages. The court in *Lacy-McKinney v. Taylor, Bean & Whitaker Mortgage Corp., supra,* 937 N.E.2d 853, observed that the public policy of HUD supported a conclusion that the HUD servicing responsibilities "are binding conditions precedent that must be complied with before a mortgagee has the right to foreclose on a HUD property." (*Id.* at pp. 863–864.) The court cited the policy, which had been explicitly set forth by a New Jersey court, as follows: " 'Families who receive HUD-insured mortgages do not meet the standards required for conventional mortgages. It would be senseless to create a program to aid families for whom homeownership would otherwise be impossible without promulgating mandatory regulations for HUD-approved mortgagees to insure that objectives of the HUD program are met. Foreseeable obstacles to these families' maintaining regular payments, such as temporary illness, unemployment or poor financial management, should be handled with a combination of understanding and efficiency by mortgagees or servicers. Poor servicing techniques such as computerized form letters and unrealistic forbearance agreements as were used by Associated defeat the purpose of the [NHA] and the HUD program. The prevention of foreclosure in HUD mortgages wherever possible is essential. The HUD program's objectives cannot be attained if HUD's involvement begins and ends with the purchase of the home and the receipt of a mortgage by a low-income family.' " (*Id.* at p. 863, quoting *Associated East Mortgage Co. v. Young* (1978) 163 N.J. Super. 315, 329 [394 A.2d 899, 906].)

Accordingly, we reject the lenders' argument that the purpose of the HUD servicing requirements is to benefit HUD exclusively and conclude that a significant purpose is to prevent foreclosures, which also benefits the borrower.

4. *State Law and HUD Regulations*

When distinguishing between cases involving judicial foreclosures and nonjudicial foreclosures, the lenders maintain that California adheres to a strict statutory scheme for nonjudicial foreclosure, which is codified in Civil Code section 2924 et seq. They contend that California law does not permit the courts to graft new requirements onto the statutory nonjudicial foreclosure requirements. They rely on *Moeller v. Lien* (1994) 25 Cal.App.4th 822 [30 Cal.Rptr.2d 777] and *I. E. Associates v. Safeco Title Ins. Co., supra,* 39 Cal.3d at page 287 when advancing this argument.

As explained in *California Golf, L.L.C. v. Cooper* (2008) 163 Cal.App.4th 1053 [78 Cal.Rptr.3d 153] (*California Golf*), the cases cited by the lenders "did not conclude that no remedies outside those provided by the nonjudicial foreclosure statutes are available simply because the Legislature intended to occupy the field. Instead, [these courts] also considered the *policies* advanced by the statutory scheme, and whether those policies would be frustrated by the allowance of the additional remedy. (*I. E. Associates v. Safeco Title Ins. Co., supra*, 39 Cal.3d at pp. 288–289 [concluding that expanding the notice ·obligations of the trustee would not be supported by policy]; [see] *Residential Capital v. Cal-Western Reconveyance Corp.* [(2003)] 108 Cal.App.4th [807,] 827, 829 [134 Cal.Rptr.2d 162] [declining to 'graft[] a tort remedy onto a comprehensive statutory scheme in the absence of a compelling justification for doing so,' and concluding that the addition of the proposed remedy would not fit within the comprehensive statutory scheme]; *Moeller v. Lien, supra*, 25 Cal.App.4th at p. 834 [concluding that '[i]t would be inconsistent with the comprehensive and exhaustive statutory scheme regulating nonjudicial fore-closures to incorporate another unrelated cure provision into statutory nonju-dicial foreclosure proceedings'].)" (*California Golf*, at p. 1070.)

■ The court in *California Golf, supra*, 163 Cal.App.4th 1053, noted the following: "It is clear, then, that the mere existence of a comprehensive statutory scheme does not necessarily eliminate all further remedies without the consideration of the relevant policy concerns. Indeed, California courts have repeatedly allowed parties to pursue additional remedies for misconduct arising out of a nonjudicial foreclosure sale when not inconsistent with the policies behind the statutes. In *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1231 [44 Cal.Rptr.2d 352, 900 P.2d 601], our Supreme Court concluded that a lender who obtained the property with a full credit bid at a foreclosure sale was not precluded from suing a third party who had fraudulently induced it to make the loan. The court concluded that ' "the antideficiency laws were not intended to immunize wrongdoers from the consequences of their fraudulent acts" ' and that, if the court applies a proper measure of damages, ' "fraud suits do not frustrate the antideficiency policies because there should be no double recovery for the beneficiary." ' (*Id.* at p. 1238.) In *South Bay Building Enterprises, Inc. v. Riviera Lend-Lease, Inc.* (1999) 72 Cal.App.4th 1111, 1121 [85 Cal.Rptr.2d 647], the court held that a junior lienor retains the right to recover damages from the trustee and the beneficiary of the foreclosing lien if there have been material irregularities in the conduct of the foreclosure sale. (See also *Melendrez v. D & I Investment, Inc.* [(2005)] 127 Cal.App.4th [1238,] 1257–1258 [26 Cal.Rptr.3d 413]; *Lo v. Jensen* (2001) 88 Cal.App.4th 1093, 1095 [106 Cal.Rptr.2d 443] [a trustee's sale tainted by fraud may be set aside].)" (*California Golf*, at pp. 1070–1071.) The court in *California Golf* concluded that the policy interests furthered by

the statutory scheme governing nonjudicial foreclosure sale were not undermined by the policy interests underlying California Uniform Commercial Code section 3312, which governs the use of cashier's checks. (*California Golf*, at pp. 1071–1072.)

■ Here, the lenders have not persuasively argued that obligating lenders to comply with HUD's face-to-face interview requirements in FHA loans would compromise the policy regarding nonjudicial foreclosure sales. The purposes for the nonjudicial foreclosure statutes are the following: " ' " '(1) to provide the creditor/beneficiary with a quick, inexpensive and efficient remedy against a defaulting debtor/trustor; (2) to protect the debtor/trustor from wrongful loss of the property; and (3) to ensure that a properly conducted sale is final between the parties and conclusive as to a bona fide purchaser.' [Citations.]" [Citation.]' [Citation.]" (*California Golf, supra*, 163 Cal.App.4th at p. 1070.) Requiring compliance with the HUD face-to-face interview would not deprive the lenders of a quick and inexpensive remedy; it merely would ensure that the lenders comply with the express terms set forth in the HUD regulations and incorporated into the FHA deeds of trust prior to seeking this quick and inexpensive remedy. Furthermore, the goal of protecting the borrower from a wrongful loss of property is enhanced as the interview may prevent the need for foreclosure. The lenders voluntarily agreed to purchase these FHA loans in exchange for the government's backing against default. Thus, as the Attorney General stresses, they voluntarily subjected themselves to the additional requirements designed to avoid the necessity for foreclosure.

## 5. The Interview as Distinct from Loss Mitigation Measures

The lenders argue that even if loss mitigation measures in the HUD servicing regulations are conditions precedent, the face-to-face interview is not. They maintain that the interview requirement is to establish a repayment plan and is not intended as a loss mitigation measure. They assert that the face-to-face interviews are not a material term in the deed of trust and the failure to have face-to-face interviews does not prejudice the borrower.

The lenders emphasize that part 203.501 identifies the loss mitigation measures, and the interview is not mentioned in this provision.[9] Unlike the

---

[9] Part 203.501 reads: "Mortgagees must consider the comparative effects of their elective servicing actions, and must take those appropriate actions which can reasonably be expected to generate the smallest financial loss to the Department. Such actions include, but are not limited to, deeds in lieu of foreclosure under § 203.357, pre-foreclosure sales under § 203.370, partial claims under § 203.414, assumptions under § 203.512, special forbearance under §§ 203.471 and 203.614, and recasting of mortgages under § 203.616. HUD may prescribe conditions and requirements for the appropriate use of these loss mitigation actions, concerning such matters

loss mitigation measures, the interview requirement does not require the lender to offer any relief to the borrower. The HUD regulations impose the duty to mitigate "[b]efore four full monthly installments due on the mortgage have become unpaid" (§ 203.605(a)), but the interview must take place "before three full monthly installments due on the mortgage are unpaid" (§ 203.604(b)).[10] Thus, the duty to mitigate, according to the lenders, arises only after the borrower misses four monthly payments. They argue that paragraph 9 should be construed narrowly to incorporate only those sections that deal specifically with a failure to make payments due.

The lenders add that HUD's own 1989 notice of policy published in the Federal Register, which addressed the creation of mortgage instruments for use in the FHA mortgage insurance program, supports their position that paragraph 9 is required simply to "inform the borrower" of HUD's servicing responsibilities, and does not indicate a requirement that the interview be completed prior to foreclosure. The lenders quote extensively from HUD's notice of policy, which was published on June 29, 1989, under "Requirements for Single Family Mortgage Instruments" in the Federal Register. Under section 27599, it states the following: "A commenter made specific suggestions to eliminate language referring to regulations issued by the Secretary in the default section of the mortgage instrument as well as other similar references. The commenter noted that such language would create foreclosure proceedings that would be more time consuming and expensive. The borrower's attorneys could commence exhaustive discovery to determine whether the lender met all of the servicing requirements. We rejected the commenter's suggestions that the references to regulations by the Secretary will impair the lender's ability to successfully defend a suit. HUD does not intend to create a conflict between the mortgage language and regulations, and there should be no adverse impact of informing the borrower that some regulations procedures exist which limit a lender's rights to foreclose." (54 Fed.Reg. 27599 (June 29, 1989).)

The HUD's notice of policy continues as follows: "We note that the proposed mortgage language does not incorporate all of HUD's servicing requirements into the mortgage, but simply prevents acceleration and foreclosure on the basis of the mortgage language when foreclosure would not be permitted by HUD regulations. For example, [section] 203.606, specifically prohibits a mortgagee from foreclosing unless three full monthly payments

---

as owner-occupancy, extent of previous defaults, prior use of loss mitigation, and evaluation of the mortgagor's income, credit and property."

[10] Part 203.605(a) provides that the duty to mitigate is as follows: "Before four full monthly installments due on the mortgage have become unpaid, the mortgagee shall evaluate on a monthly basis all of the loss mitigation techniques provided at § 203.501 to determine which is appropriate. Based upon such evaluations, the mortgagee shall take the appropriate loss mitigation action. . . ."

due on the mortgage are unpaid. As long as this requirement remains in the regulations, we do not expect mortgagees to violate it even though the mortgage fails to repeat the requirement, and we believe that a borrower could appropriately raise the regulatory violation in his or her defense. If a mortgagee has violated parts of the servicing regulations which do not specifically state prerequisites to acceleration or foreclosure, however, the reference to regulations in the mortgage would not be applicable. HUD retains the general position recited in [section] 203.500, that whether a mortgagee's refusal or failure to comply with servicing regulations is a legal defense is a matter to be determined by the courts." (54 Fed.Reg. 27599 (June 29, 1989).)

The language in the Federal Register cited by the lenders does not evince an intent to permit lenders to ignore the interview requirement. This language does not indicate that the loss mitigation measures are the sole requirements preventing acceleration and foreclosure. (See 54 Fed.Reg. 27599 (June 29, 1989).) The deed of trust incorporates the interview requirements and it would be inappropriate to deny that this contract language has any effect.

As already discussed, the deed of trust expressly incorporated regulations issued by the HUD Secretary, including the requirement of a face-to-face interview, and such regulations must be followed prior to acceleration and foreclosure. The commencement of the duty to mitigate and the interview are not mutually exclusive.

█ Moreover, we disagree with the lenders that the interview is not a material term and has no benefit for the borrower. As already discussed, a clear objective of the HUD servicing objectives is to minimize the possibility of foreclosure. "Collection techniques must be adapted to individual differences in mortgagors and take account of the circumstances peculiar to each mortgagor." (§ 203.600.) Under the HUD regulations, a lender is required to "have a face-to-face interview with the mortgagor, or make a reasonable effort to arrange such a meeting, before three full monthly installments due on the mortgage are unpaid. If default occurs in a repayment plan arranged other than during a personal interview, the mortgagee must have a face-to-face meeting with the mortgagor, or make a reasonable attempt to arrange such a meeting within 30 days after such default and at least 30 days before foreclosure is commenced . . . ." (§ 203.604(b).) A face-to-face meeting is intended to occur before the duty to mitigate arises and provides the lender with the opportunity to discuss a repayment plan and to inform the borrower of any other available assistance; this is especially significant when the borrower has a general lack of experience in financial management and limited access to information about resources to avoid foreclosure. This provision may not require a lender to grant the borrower forbearance or a

loan modification, but it does provide the lender with the opportunity to discuss various options and resources with the borrower to avoid further default.

One of the purposes of the interview is to provide borrowers with information about possible resources or loss mitigation options that might have permitted them to avoid foreclosure. "One of the largest complaints of homeowners who are sued in foreclosure is that when they began having trouble making payments, they were unable to have any meaningful communication with their lender regarding their circumstances or options." (Bahls & Hunt, *Abhorring a Forfeiture: The Importance of Equitable Jurisdiction in a Foreclosure Crisis* (2012) 41 Stetson L.Rev. 779, 806, fn. omitted.) In *Bankers Life Co. v Denton, supra,* 458 N.E.2d 203, the court concluded that the legislative purpose of the NHA "is to assist in providing a decent home and a suitable living environment for every American family. Thus, the primary beneficiaries of the [NHA] and its implementing regulations are those receiving assistance through its various housing programs. This would include the . . . mortgagors of a [HUD] insured mortgage." (*Bankers Life,* at p. 205.)

We conclude that the face-to-face interview is a material term in the FHA deed of trust and failing to comply with this term is prejudicial to the borrower.

### 6. *The* Ejusdem Generis *Doctrine Does Not Apply*

The lenders contend that the *Mathews* court incorrectly read into paragraph 9 of the deed of trust the interview as a condition precedent to foreclosure as the *Mathews* court failed to apply the *ejusdem generis* canon of construction.

■ "Under the principle of *ejusdem generis* (literally, 'of the same kind') [citations], where specific words follow general words in a contract, 'the general words are construed to embrace only things similar in nature to those enumerated by the specific words.' [Citations]." (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1045 [72 Cal.Rptr.3d 210], fn. omitted; see *Huverserian v. Catalina Scuba Luv, Inc.* (2010) 184 Cal.App.4th 1462, 1468–1469 [110 Cal.Rptr.3d 112].)

The lenders claim that paragraph 9 permits acceleration of the entire amount due if the borrower fails "to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment" or fails "for a period of thirty days, to perform any other obligations contained in this Security Instrument." They argue that under the *ejusdem generis* rule, the reference to "except as limited by regulations issued

by" HUD, which is at the beginning of the paragraph, must be interpreted to refer to regulations of the same kind. Regulations of the same kind, they argue, are found under part 203.606.[11] Paragraph 9, according to the lenders, refers to regulations that prohibit or permit debt acceleration under parts 203.550(d)[12] and 203.554.[13] Thus, according to the lenders, a foreclosure cannot occur in only those situations where the default is a present inability to pay a substantial escrow shortage or the default is a failure to pay a late charge or charges. The lenders declare that HUD's own policy statement, as set forth in the Federal Register, stated that not all of HUD's servicing requirements were incorporated into the mortgage.[14]

---

[11] Part 203.606 provides: "(a) Before initiating foreclosure, the mortgagee must ensure that all servicing requirements of this subpart have been met. The mortgagee may not commence foreclosure for a monetary default unless at least three full monthly installments due under the mortgage are unpaid after application of any partial payments that may have been accepted but not yet applied to the mortgage account. In addition, prior to initiating any action required by law to foreclose the mortgage, the mortgagee shall notify the mortgagor in a format prescribed by the Secretary that the mortgagor is in default and the mortgagee intends to foreclose unless the mortgagor cures the default.
"(b) If the mortgagee determines that any of the following conditions has been met, the mortgagee may initiate foreclosure without the delay in foreclosure required by paragraph (a) of this section: [¶] (1) The mortgaged property has been abandoned, or has been vacant for more than 60 days. [¶] (2) The mortgagor, after being clearly advised of the options available for relief, has clearly stated in writing that he or she has no intention of fulfilling his or her obligation under the mortgage. [¶] (3) The mortgaged property is not the mortgagor's principal residence and it is occupied by tenants who are paying rent, but the rental income is not being applied to the mortgage debt. [¶] (4) The property is owned by a corporation or partnership." (§ 203.606)

[12] Part 203.550(d) states: "The mortgagee shall not institute foreclosure when the only default of the mortgagor occupant is a present inability to pay a substantial escrow shortage, resulting from an adjustment pursuant to this section, in a lump sum."

[13] Part 203.554 provides: "(a) A mortgagee shall not commence foreclosure when the only default on the part of the mortgagor is the failure to pay a late charge or charges (§ 203.25), except as provided in § 203.556. [¶] (b) A late charge attributable to a particular installment payment due under the mortgage shall not be deducted from that installment. However, if the mortgagee thereafter notifies the mortgagor of his obligation to pay a late charge, such a charge may be deducted from any subsequent payment or payments submitted by the mortgagor or on his behalf if this is not inconsistent with the terms of the mortgage. Partial payments shall be treated as provided in § 203.556. [¶] (c) A payment may be returned because of failure to include a late charge only if the mortgagee notifies the mortgagor before imposition of the charge of the amount of the monthly payment, the date when the late charge will be imposed and either the amount of the late charge or the total amount due when the late charge is included. [¶] (d) During the 60-day period beginning on the effective date of transfer of the servicing of a mortgage, a late charge shall not be imposed on the mortgagor with respect to any payment on the loan. No payment shall be treated as late for any other purpose if the payment is received by the transferor servicer, rather than the transferee servicer that should receive the payment, before the due date (including any applicable grace period allowed under the mortgage documents) applicable to such payment."

[14] The language in HUD's policy statement quoted by the lenders is the following: "We note that the proposed mortgage language does not incorporate all of HUD's servicing requirements

We reject the lenders' argument that we should apply the *ejusdem generis* rule. The doctrine of *ejusdem generis* is employed as an interpretive aid only when the language in the contract or statute is ambiguous. (*The Zumbrun Law Firm v. California Legislature* (2008) 165 Cal.App.4th 1603, 1619 [82 Cal.Rptr.3d 525].) Moreover, use of the *ejusdem generis* doctrine is inappropriate where to do so "would frustrate the intent underlying the statute." (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1012 [9 Cal.Rptr.2d 358, 831 P.2d 798]; see *Huverserian v. Catalina Scuba Luv, Inc., supra*, 184 Cal.App.4th at pp. 1468–1469 ["In a contract, ' "[w]here general words follow the enumeration of particular kinds or classes of persons or things, the general words will, unless a contrary intent is manifested, be construed as applicable only to persons or things of the same general nature or class as those specifically enumerated." ' "].)

We disagree that there is an ambiguity in paragraph 9, and no language in the deed of trust indicates that the interview requirement under the HUD regulations is to be excluded. The lenders' construction clearly frustrates the intent of the parties as expressly set forth in the deed of trust. Paragraph 9 unambiguously states that all of the HUD regulations apply and, in subdivision (d) of paragraph 9, under the heading "Regulations of HUD Secretary," the agreement reads as follows: "In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument *does not authorize acceleration or foreclosure if not permitted by regulations* of the Secretary." (Italics added.)

Furthermore, the HUD regulations make it plain that mortgagees must comply with all servicing requirements, including the interview requirements, prior to foreclosing. The HUD regulations provide in pertinent part as follows: "It is the intent of [HUD] that no mortgagee shall commence foreclosure or acquire title to a property until the requirements of this subpart have been followed." (§ 203.500.) Elsewhere, the regulations require that "[b]efore initiating foreclosure, the mortgagee must ensure that all servicing requirements of this subpart have been met. . . ." (§ 203.606(a).)

■ Similarly to *Mathews*, numerous courts in various jurisdictions hold that the face-to-face interview is a condition precedent to foreclosure. (See, e.g., *U.S. Bank, N.A. v. Detweiler* (2010) 191 Ohio App.3d 464, 472 [2010 Ohio 6408, 946 N.E.2d 777, 783]; *Lacy-McKinney v. Taylor, Bean & Whitaker Mortgage Corp., supra*, 937 N.E.2d at p. 864; *Bankers Life Co. v. Denton, supra*, 458 N.E.2d at p. 205.) We agree with these decisions that the HUD

into the mortgage, but simply prevents acceleration and foreclosure on the basis of the mortgage language when foreclosure would not be permitted by HUD regulations." (54 Fed.Reg. 27599 (June 29, 1989).)

regulations are conditions precedent that must be followed before a mortgagee has the right to initiate a nonjudicial foreclosure on an FHA mortgage. Under the clear and unambiguous language in paragraph 9 of the deed of trust, the lenders had to comply with the HUD servicing regulations before commencing foreclosure on the Pfeifer's FHA mortgage. Here, according to the Pfeifers' third amended complaint, the lenders did not comply with the HUD regulations, as they did not have a face-to-face interview. (See § 203.604; see also § 203.500 ["no mortgagee shall commence foreclosure or acquire title to a property until the requirements of this subpart have been followed"].)

Wells Fargo in its amicus curiae brief maintains that the *Mathews* court did not recognize the limitation on part 203.604(c) that provides that a face-to-face meeting is not required if the " 'mortgaged property is not within 200 miles of the mortgagee, its servicer, or a branch office of either.' " It argues that the *Mathews* court incorrectly interpreted "branch office" to mean "every type of business and service supplied by the mortgagee, including loan origination . . . ." (*Mathews, supra,* 724 S.E.2d at pp. 203–204.) The interpretation of "branch office" is not an issue before us. The Pfeifers have alleged that the lenders did not have a face-to-face interview as required by the Code of Federal Regulations. Whether a face-to-face interview actually occurred and whether such an interview was not required because the mortgaged property was not within 200 miles of the "mortgagee, its servicer, or a branch office of either," are factual issues not currently before us.

7. *The Significance of Requiring Specific Language in the FHA Deed of Trust*

At this court's request, we asked the parties to discuss whether the HUD regulations were actually negotiated and whether the fact that these terms were mandated by the regulations was significant. The borrowers claim that they did negotiate for these terms and request leave to amend their pleading to add this claim. The lenders maintain that these terms were not negotiated and merely reflect the language required by part 203.17(a)(2)(i) to be in the deed of trust. We will presume for the purposes of this appeal that the terms were not negotiated, as it is clear that all FHA deeds of trust include this requisite language.

We, however, agree with the *Mathews* court that the fact that this language is mandated is of no consequence. The *Mathews* court rejected the argument that the language in the deed of trust should not be construed to incorporate the regulations because the language was imposed by HUD rather than negotiated by the parties. (*Mathews, supra,* 724 S.E.2d at p. 202.) The court explained that there was no reason to require this language in the deeds

of trust unless it was to apply to the relationship between the lender and the borrower. The court elaborated: "The regulations themselves govern the relationship between the lender and the government; there is no reason to refer to them in the deed of trust other than to affect the duties of the parties to it. If . . . HUD has a contrary intention, it may either (a) cease to require or allow language that incorporates its regulations as conditions precedent to acceleration or foreclosure in the deeds of trust or (b) require or allow language that expressly states its intent that its regulations are not conditions precedent. It has done neither." (*Mathews*, at pp. 202–203.)

Furthermore, as already noted, the lenders voluntarily agreed to offer or purchase FHA loans in exchange for the government's backing against defaults and voluntarily subjected themselves to program requirements under the HUD regulations.

8. *The Consequences of the Borrowers' Defaulting on the Loan*

The lenders emphasize that the Pfeifers defaulted on their loan. They argue that this default should bar the Pfeifers' claims against them.

"The rights and powers of trustees in nonjudicial foreclosure proceedings have long been regarded as strictly limited and defined by the contract of the parties and the statutes." (*I. E. Associates v. Safeco Title Ins. Co., supra*, 39 Cal.3d at p. 287.) As the court in *Mathews* explained, "The fact that a borrower is in arrears does not allow the trustee to circumvent the conditions precedent" to foreclosure. (*Mathews, supra*, 724 S.E.2d at p. 199.) Indeed, "[t]he conditions precedent in the deed of trust which govern the accrual of [the trustee's] latent power to foreclose" do not become relevant *until* the borrower has "first breached the deed of trust in some way." (*Ibid.*) "Therefore, prohibiting the borrower who has breached from bringing an action to enforce the conditions precedent in a deed of trust would nullify such conditions. The mere fact of the borrower's breach alone would become, *de facto*, the only condition precedent to foreclosure." (*Id.* at pp. 199–200.) The court in *Mathews* emphasized that "lenders require deeds of trust precisely because they contemplate the possibility of non-payment [and] . . . the deed of trust is a contract in which the parties have agreed that material breach of the note by nonpayment will not deprive borrowers of their rights to enforce the conditions precedent." (*Id.* at p. 200.)

We agree with the reasoning of the *Mathews* court and hold that the Pfeifers' default does not bar their claim that the lenders cannot proceed with the foreclosure prior to complying with the HUD servicing requirements.

### 9. *Failure to Allege Full Tender*

The lenders point out that the Pfeifers did not allege tender of the amount owed on their secured debt. This failure to allege full tender should, according to the lenders, prevent the Pfeifers from asserting any wrongful foreclosure claim.

 "A full tender must be *made* to set aside a foreclosure sale, based on equitable principles." (*Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, 526 [134 Cal.Rptr.3d 604].) Courts, however, have not required tender when the lender has not yet foreclosed and has allegedly violated laws related to avoiding the necessity for a foreclosure. (See, e.g., *Mabry v. Superior Court* (2010) 185 Cal.App.4th 208, 225–226 [110 Cal.Rptr.3d 201].)

As already discussed, one of the purposes of the interview process is to prevent foreclosure. Thus, to permit a foreclosure when the lender has not complied with the requirements that may have prevented any need for a foreclosure would defeat a salient purpose of the HUD regulations. The only remedy available to a borrower who is delinquent on the loan—but who has not had a face-to-face interview—is to postpone the foreclosure sale. If the face-to-face interview occurred, "it is highly conceivable that" the Pfeifers "may [have been] able to remedy their delinquenc[y] and avoid foreclosure." (See *Wells Fargo v. Neal, supra,* 922 A.2d at p. 553.)

Moreover, the Pfeifers have alleged in their third amended complaint that any foreclosure would be void based on the lenders' failure to comply with the HUD regulations. Courts have recognized various exceptions to the tender rule, including an exception based on an allegation that a foreclosure sale is void. (See *Dimock v. Emerald Properties* (2000) 81 Cal.App.4th 868, 877–878 [97 Cal.Rptr.2d 255] [equity is not necessary to challenge a void sale and a person overcoming a void sale is "not required to tender any of the amounts due under the note"]; see also *In re Salazar* (S.D.Cal. 2011) 448 B.R. 814, 819 [tender of the full amount of the loan would not be required to set aside the sale if the bank was not authorized to foreclose the deed of trust under Civ. Code, § 2932.5].)

Additionally, in the present case, no foreclosure sale has occurred. A number of courts have explicitly held that the tender rule applies only in cases seeking to set aside a completed sale, rather than an action seeking to prevent a sale in the first place. (See *Barrionuevo v. Chase Bank, N.A.* (N.D.Cal. 2012) 885 F.Supp.2d 964; *Vissuet v. Indymac Mortg. Services* (S.D.Cal. Mar. 19, 2010, No. 09-CV-2321-IEG (CAB)) 2010 WL 1031013.) The fact that a borrower is in arrears does not allow the lender to circumvent the conditions precedent.

The cases cited by the lenders in support of applying the tender rule are distinguishable from the present case in that they did not involve a challenge to a void sale or an objection to a foreclosure proceeding prior to a sale. (See, e.g., *Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1109 [51 Cal.Rptr.2d 286]; *United States Cold Storage v. Great Western Savings & Loan Assn.* (1985) 165 Cal.App.3d 1214, 1222–1226 [212 Cal.Rptr. 232] [plaintiff challenged irregularities in sale notice or procedure after trustee sale was held]; *Arnolds Management Corp. v. Eischen* (1984) 158 Cal.App.3d 575, 577 [205 Cal.Rptr. 15] ["before a junior lienor may set aside a nonjudicial foreclosure of real property under a deed of trust because of irregularities in the sale, the junior lienor must first tender the full amount owing on the senior obligation"]; *Lawrence v. Aurora Loan Services LLC* (E.D.Cal., Jan. 25, 2010, No. CV F09-1598 LJO DLB) 2010 WL 364276 [dismissed claim to set aside nonjudicial foreclosure sale of the property based on improper notice when there was no offer to tender amount owed].) The lenders also quote the following from *Alicea v. GE Money Bank* (N.D.Cal., July 16, 2009, No. C 09-00091 SBA) 2009 WL 2136969: "When a debtor is in default of a home mortgage loan, and a foreclosure is either pending or has taken place, the debtor must allege a credible tender of the amount of the secured debt to maintain any cause of action for wrongful foreclosure." (*Id.* at p. *3.) *Alicea* involved a situation where the foreclosure sale had already occurred. Additionally, there was no allegation in *Alicea* that the foreclosure sale was void.

We thus conclude that the Pfeifers do not need to allege that they will tender or have tendered the full amount due on their note.

E. *Conclusion*

Accordingly, we conclude that the failure to allege tender of the full amount owed on the obligation does not bar the Pfeifers' claim for declaratory relief or their request for injunctive relief based on wrongful foreclosure, because the lenders have not yet foreclosed and the Pfeifers have alleged that the lenders have not complied with the HUD servicing regulations, which are conditions precedent to foreclosing. We hold that the Pfeifers can request the court to enjoin the nonjudicial foreclosure procedure based on the failure to conduct a face-to-face interview as mandated by the FHA deed of trust and can request declaratory relief stating that the lenders do not have the authority to proceed with a nonjudicial foreclosure until they comply with the HUD servicing regulations. The Pfeifers do not, however, have a claim for damages.

## IV. *Other Claims*

In their third amended complaint, the Pfeifers also set forth causes of action for breach of the implied covenant of good faith and fair dealing, breach of contract, and fraud and deceit.[15] Except for the breach of contract claim, the Pfeifers' opening brief did not include any specific argument or supporting authority regarding these causes of action; therefore, we will consider any appeal of these claims waived.[16] " 'Although our review of a [demurrer] is de novo, it is limited to issues [that] have been adequately raised and supported in plaintiffs' brief. [Citations.] Issues not raised in an appellant's brief are deemed waived or abandoned. [Citation.]' " (*Davies v. Sallie Mae, Inc., supra,* 168 Cal.App.4th at p. 1096.) An appellate court "will not develop the appellants' arguments for them . . . ." (*Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [33 Cal.Rptr.2d 838].)

We agree with the trial court's rejection of the breach of contract claim. The HUD regulations at issue here were promulgated under the NHA, and we agree with the majority of courts that have concluded that the breach of these regulations do not ordinarily provide a private right of action. (See *Roberts v. Cameron-Brown Co., supra,* 556 F.2d at p. 360.) Accordingly, we hold that there is no private right of action available to the Pfeifers for the lenders' noncompliance with the servicing regulations.[17] (See *Federal National Mortgage Assn. v. LeCrone* (6th Cir. 1989) 868 F.2d 190, 193.)

---

[15] The Pfeifers expressly abandoned their sixth cause of action for financial elder abuse for this appeal.

[16] We will not consider any arguments raised for the first time in the Pfeifers' reply brief.

[17] We also agree with the trial court's rejection of the wrongful foreclosure claim to the extent that the Pfeifers are seeking any damages. In their third amended complaint and/or in their reply brief in this court, the Pfeifers claim wrongful foreclosure based on Civil Code sections 2923.5 and 2923.6, and an entitlement to modify the loan repayment terms pursuant to the Home Affordable Modification Program (HAMP).

Civil Code section 2923.5 applies to "mortgages or deeds of trust recorded from January 1, 2003, to December 31, 2007, inclusive." (Civ. Code, § 2923.5, subd. (i).) Here, the deed of trust securing the Pfeifers' note was recorded in April 2008, and Civil Code section 2923.5 does not apply. The Pfeifers have no private right of action under Civil Code section 2923.6, and this statute does not require loan servicers to modify loans. (See, e.g., *Rodriguez v. JP Morgan Chase & Co.* (S.D.Cal. 2011) 809 F.Supp.2d 1291, 1296.)

Finally, as to HAMP, the Pfeifers have no right to enforce the HAMP loan modification provisions. The majority of federal courts have concluded that homeowners are not intended third party beneficiaries of HAMP contracts. (See *Wigod v. Wells Fargo Bank, N.A.* (7th Cir. 2012) 673 F.3d 547, 559, fn. 4; *Lucia v. Wells Fargo Bank, N.A.* (N.D.Cal. 2011) 798 F.Supp.2d 1059, 1070–1071.) We agree with the reasoning of these courts, and conclude that the Pfeifers are presumed incidental beneficiaries unless they demonstrate a clear intent to the contrary. (See *Klamath Water Users Protective Assn. v. Patterson* (9th Cir. 1999) 204 F.3d 1206, 1211.) The Pfeifers have not directed us to any part of the deed of trust establishing an intent to make them third party beneficiaries.

## DISPOSITION

The judgment is reversed as to the Pfeifers' claims for wrongful foreclosure and for declaratory relief; the order denying injunctive relief is also reversed. With respect to all other causes of action, the judgment is affirmed. The parties are to bear their own costs on appeal.

Haerle, Acting P. J., and Richman, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 20, 2013, S207740. Chin, J., did not participate therein.